Paul S. Padda
NV Bar No. 10417
PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, NV 89103
Tel: (702) 366- 1888
psp@paulpaddalaw.com

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Benjamin J. Bauer, MN Bar No. 0398853*
bbauer@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

* LR IA 11-2 petition approved

ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| Maggie Thomson, as representative of a class of similarly situated persons, and on behalf of the Caesars Entertainment Corporation Savings & Retirement Plan,<br><br>     Plaintiff,<br><br> v.<br><br>Russell Investments Trust Company, Caesars Holdings Inc., the Plan Investment Committee, and the 401(k) Plan Committee,<br><br>     Defendants. | **Case No. 2:21-cv-00961-GMN-BNW**<br><br><br>**FIRST AMENDED COMPLAINT –<br>CLASS ACTION** |

1

**NATURE OF THE ACTION**

2

1.      Plaintiff Maggie Thomson ("Plaintiff"), as representative of the class defined herein,

3

and on behalf of the Caesars Entertainment Corporation Savings & Retirement Plan ("Plan"), brings

4

this action against Defendants Caesars Holdings Inc. ("Caesars"), the Plan Investment Committee,

5

the 401(k) Plan Committee, and Russell Investments Trust Company ("Russell") (together,

6

"Defendants") for breaches of their fiduciary duties under the Employee Retirement Income

7

Security Act ("ERISA"). As described herein, Russell obtained control of the Plan's investment

8

menu in 2017 and promptly filled the Plan with its own poorly performing proprietary funds.

9

Russell's gambit was a life preserver for its struggling funds and brought $1.4 billion in new

10

investment at a critical time when other plan sponsors were leaving Russell's funds. The deal did

11

not promote the interest of Plan participants, however, as the Plan already had in place a menu of

12

leading funds that consistently outperformed Russell's funds at similar or lower levels of risk.

13

Russell's self-serving swap has been disastrous for the Plan and cost participants more than $100

14

million in lost investment earnings to date. Plaintiff brings this action to recover these losses and

15

obtain equitable relief and other appropriate relief as provided by ERISA.

16

**PRELIMINARY STATEMENT**

17

2.      The Plan holds the retirement savings of more than 40,000 employees of Caesars

18

affiliates nationwide. In the fallout of the leveraged buyout (LBO) of the company in 2008 by

19

private equity firms and resulting bankruptcy, Plan participants have struggled to build their nest

20

eggs. The company's owners eliminated matching contributions for three straight years and brought

21

them back at anemic levels until well after the company emerged from bankruptcy and related

22

litigation in late 2017.

23

3.      As Caesars' owners and executives scrambled to solve the company's unsustainable

24

LBO debt, unloading Plan responsibilities to a "fiduciary outsourcing" provider like Russell was

25

an attractive option. Russell took over control of the Plan's investment menu in 2017 as a fractured

26

Caesars was divvied up among creditors.

27

28

1

4. The Plan's menu did not need an overhaul. The Plan offered leading, low-cost investment funds, including age-based balanced options[1] managed by State Street with long track records of success. But instead of prudently and objectively evaluating the Plan's needs, Russell transferred all of the Plan's $1.4 billion in assets to its own proprietary funds, including more than $1 billion to its fledgling age-based funds. Russell did so despite the fact that Russell's age-based funds had yielded disappointing results and had lost or were soon to lose other key investors (including Russell's own employee plan).

5. There was no participant-focused justification for Russell's self-serving swap at the time. Over short and long periods prior to the transfer, the existing options, on balance, performed better at similar or lower levels of risk. The deal was boon to Russell, however, which was able to add $1.4 billion in new investment to help prop up its funds at a difficult time for the funds.

6. Russell's longshot bet on itself did not pay off for participants. Russell's funds have continued to underperform the funds that they replaced while taking on the similar or higher levels of risk. The Plan has suffered more than $100 million in lost investment returns to date as a result of Russell's replacement of the Plan's funds with Russell funds.

7. Fiduciary duties under ERISA are "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted). Russell's conflicted judgment breached multiple ERISA fiduciary standards, including its duties of loyalty to Plan participants and its duty of prudence. *See Lowen v. Tower Asset Mgt., Inc.*, 829 F.2d 1209, 1219 (2d Cir. 1987) ("[P]lan trustees [may] delegate investment authority to a professional advisor *who then becomes a fiduciary with a duty of care and duty of loyalty to the plan*") (emphasis added). And Caesars' acquiescence to Russell breached its own "exacting" fiduciary obligations to prudently select and monitor an outsourcing provider for the Plan. *See Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983); *Lowen*, 829 F.2d at 2020 (the appointing fiduciary may share "joint and several liability" with outsourced fiduciary based on its own conduct).

8. Plaintiff brings this action under ERISA to recover the Plan's losses, prevent further mismanagement of the Plan, and obtain other appropriate relief.

---

[1] "Age-based" funds are also known as "target date" funds. *See infra*, ¶ 38, n. 13.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

10.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where breaches of fiduciary duties giving rise to this action occurred, and where a Defendant resides and may be found.

**PARTIES**

11.     Plaintiff Maggie Thomson resides near Chicago, Illinois. Plaintiff is a current participant in the Plan, and has been a participant since 2014. Plaintiff's account was invested in the State Street age-based fund for her age group until 2017, when the State Street option was removed from the Plan and her account was transferred to Russell's competing age-based fund. Plaintiff's account would be worth more today if Defendants had not breached their fiduciary duties as described herein.

12.     Defendant Caesars Holdings Inc. is a holding company that owns gaming and other entertainment and hospitality operations worldwide. These affiliated operations include Caesars Palace, Planet Hollywood, Harrah's, Horseshoe Casinos, and the World Series of Poker, among others. Prior to late 2020, Caesars was known as Caesars Entertainment Corporation.[2] Caesars is the sponsor of the Plan.

13.     The Plan Investment Committee was the committee created by Caesars on or before January 1, 2016, to oversee Plan investments. Acting through its Board of Directors or a committee thereof, Caesars appointed individuals to the Plan Investment Committee to select, monitor, and remove Plan investments. Caesars also authorized the Plan Investment Committee to outsource its investment duties to an "investment manager" under the procedure established by ERISA § 3(38). All Plan Investment Committee members were employees of Caesars or affiliates, and the members

---

[2] In July 2020, Caesars was acquired by Eldorado Resorts Inc., which reorganized as Caesars Entertainment Inc., an entity distinct from, and now the ultimate owner of, the Plan's sponsor, Caesars Holdings Inc. f/k/a Caesars Entertainment Corporation. Based on the Plan's most recent public filings in October 2020, the name and sponsorship of the Plan have not changed as a result of the Eldorado acquisition.

included high-ranking Caesars executives such as the CFO. The Plan Investment Committee was dissolved and replaced by the 401(k) Plan Committee on or after July 20, 2020.

14.     The 401(k) Plan Committee is the committee created by Caesars on or after July 20, 2020, to succeed to the investment duties of the Plan Investment Committee (among other things). Acting through its Board of Directors or a committee thereof, Caesars appoints employees of Caesars or its affiliates to serve on the 401(k) Plan Committee.[3]

15.     Defendant Russell Investments Trust Company is a non-depository trust company based in Seattle.[4] Russell offers fiduciary investment services to institutional investors, including retirement plans. Among the services that Russell offers is "fiduciary outsourcing" to defined contribution retirement plans. Through its fiduciary outsourcing service, Russell takes control of plan investment menus from plan sponsors. Russell also manages proprietary collective trust funds that Russell offers as investment options to defined contribution retirement plans.

**THE PLAN**

16.     The Plan was established in 1990 by Harrah's Entertainment Inc. as a tax-deferred vehicle to help Harrah's employees save for retirement. Harrah's acquired other entertainment properties over the years, including Caesars Palace, and the entire enterprise was acquired by private equity firms in the 2008 LBO. In 2010, the company's owners renamed the Plan and the Plan's sponsor, replacing "Harrah's" with "Caesars" as the company's flagship brand. The Plan's participants include current and former employees throughout the Caesars family of companies.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution" or "individual account" plan within the meaning of 29 U.S.C. § 1002(34). The Plan is also an "ERISA section 404(c) plan", which means that participants may choose between investment options (called "designated investment alternatives") made available by the Plan's fiduciaries. *See* 29 C.F.R. § 2550.404c-1(a)(1) & (e)(4). In such plans, the set of investment options made available by a plan's fiduciaries is called the "investment menu".

---

[3] References to "the Caesars Defendants" herein include Caesars, the Plan Investment Committee, and the 401(k) Plan Committee.

[4] Russell is not affiliated with the firm that maintains and publishes "Russell" indexes. Russell was divided from the indexing business and sold to an unaffiliated private equity buyer prior to its engagement by Caesars.

*E.g.,* DEP'T OF LABOR, *Financial Factors in Selecting Plan Investments*, 85 Fed. Reg. 72846, 72863 (Nov. 13, 2020) ("[W]hen assembling, choosing, or modifying an *investment menu* for participants' investment choices …") (emphasis added).

18. As a defined contribution plan, the Plan provides retirement benefits to participants that are "limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *See Tibble v. Edison Intern.*, 575 U.S. 523, 525 (2015). Thus, the investment options made available by the Plan's fiduciaries are critical to participants' retirement outcomes.[5]

19. Defendants are fiduciaries of the Plan. Caesars is a fiduciary because it appointed members of the Plan Investment Committee and 401(k) Plan Committee and has authority to remove them. The authority to appoint and remove other fiduciaries constitutes "discretionary authority or discretionary control respecting management of [a] plan" and confers fiduciary status under ERISA, 29 U.S.C. § 1002(21)(A)(i).

20. The Plan Investment Committee and 401(k) Plan Committee are fiduciaries because the Plan Investment Committee had, and the 401(k) Plan Investment Committee has, authority to select and remove investments for the Plan, as well as the authority to outsource their investment duties to an "investment manager" under ERISA § 3(38). Authority to select and remove investments constitutes "any authority or control respecting management or disposition of [Plan] assets" and confers fiduciary status under ERISA, 29 U.S.C. § 1002(21)(A)(i). Likewise, authority to appoint and remove investment managers under ERISA § 3(38) constitutes "discretionary authority or discretionary control respecting management of [a] plan" and confers fiduciary status under ERISA, 29 U.S.C. § 1002(21)(A)(i).

---

[5] Defined contribution plans are distinct from "defined benefit" plans, as defined benefit plan participants receive fixed payouts that cannot be reduced based on the market performance of the underlying assets of their plan. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) ("Such a plan, as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment. … [T]he employer typically bears the entire investment risk and … must cover any underfunding as the result of a shortfall that may occur from the plan's investments.") (quotation marks and citations omitted); *see also Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1616 (2020) ("[P]articipants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to participants in a defined-contribution plan, and they possess no equitable or property interest in the plan[.]").

21.     In December 2016, the Investment Committee hired Russell as its fiduciary outsourcing partner under the procedure established by ERISA § 3(38). Caesars knew of Russell's appointment at the time and executed Russell's engagement agreement as to certain terms related to Caesars' corporate obligations and interests.

22.     Russell assumed control of the Plan's investment menu in August 2017. Since August 2017, Russell has exercised authority to "manage, acquire, or dispose of any asset of [the Plan]", see 29 U.S.C. § 1002(38), including the authority to select and remove investment options for the Plan. Russell's authority constitutes "authority or control respecting management or disposition of [Plan] assets" and "discretionary authority or discretionary control respecting management of [a] plan" and confers fiduciary status under 29 U.S.C. § 1002(21)(A)(i). As required by ERISA § 3(38), Russell acknowledged in writing that it is a fiduciary to the Plan.

23.     As of the end of 2016, the Plan had around 39,000 participants with account balances and $1.4 billion in assets.  The Plan offered a diversified menu of investment options that Caesars and the Investment Committee assembled and monitored with the assistance of a professional investment consultant. These options included low cost separately managed accounts and collective investment trusts in a range of asset classes, including "all-in" balanced funds tailored to the participant's age that were managed by global investment leader State Street.[6]

24.     When Russell assumed control of the Plan's investment menu in 2017, Russell replaced all of the Plan's investment options with its proprietary collective investment trusts. As of the end of 2019 (the reporting date of the Plan's most recent public filings), the Plan had around 42,000 participants and $1.6 billion in assets. Russell's affiliated funds continue to make up 100% of the Plan's investment options. Around 75% of the Plan's assets are invested in Russell's age-based funds.

**ERISA FIDUCIARY DUTIES**

25.     ERISA recognizes "that the continued well-being and security of millions of employees and their dependents are directly affected by [retirement] plans." 29 U.S.C. § 1001(a). Thus, "[t]he principal object of the statute is to protect plan participants and beneficiaries." *Boggs*

---

[6] *See* https://www.advratings.com/top-asset-management-firms (ranking State Street as the fifth largest asset management firm in the world) (last visited May 18, 2021).

*v. Boggs*, 520 U.S. 833, 845 (1997) (citation omitted). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators" and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (citing extensive legislative history).

26.     To protect plan participants, ERISA incorporates the twin fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). These fiduciary duties are the "highest known to law." *Howard*, 100 F.3d at 1488.

27.     The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals." 29 C.F.R. 2550.404a-1(c)(1); *see also* DEP'T OF LABOR, ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) ("A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.").

28.     The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that a prudent person would utilize in managing a similar plan." 29 U.S.C. § 1104(a)(1)(B). To satisfy the duty of prudence with respect to an investment, a fiduciary must "employ[] appropriate methods to investigate the merits of the investment", *Mazzola*, 716 F.2d at 1232, including considering the "the risk of loss and opportunity for gain … associated with the investment … compared to the opportunity for gain … associated with reasonably available alternatives with similar risks". 29 C.F.R. § 2550.404a-1(a)(2)(i). Where a potential conflict of interest exists, fiduciaries must engage in an "intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Howard*, 100 F.3d at 1488–89.

29.     These fiduciary duties apply to both the selection and the ongoing monitoring and retention of investment options in a defined contribution plan's menu. *See* 29 C.F.R. 2550.404c-1(d)(2)(iv) (providing that, while participants choose between investment options, plan fiduciaries have a "duty to prudently select and monitor any … designated investment alternative offered under the plan"); 29 C.F.R. § 404a-1(d)(1) (confirming that ERISA fiduciary duties "apply to a fiduciary's selection or retention of designated investment alternatives available to participants and beneficiaries in an individual account plan"); *see also Tibble*, 575 U.S. at 529. ("[A] trustee has a continuing duty to monitor trust investments and remove imprudent ones … [that] exists separate and apart from the trustee's duty to exercise prudence in selecting investments[.]").

30.     The same fiduciary standards also apply to the selection, monitoring, and retention of any service provider to whom fiduciary functions are outsourced. *See* 29 C.F.R. 2550.404c-1(d)(2)(iv) (providing that plan fiduciaries have a "duty to prudently select and monitor service providers"); 29 C.F.R. § 2509.75-8, at FR-17 ("At reasonable intervals the performance of other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards[.]").[7]

## DEFENDANTS' MISMANAGEMENT OF THE PLAN

### *The LBO and Its Effect on the Company and the Plan*

31.     In January 2008, a group of private equity firms bought out Caesars and took it private. The transaction was financed by more than $10 billion in new debt—doubling the company's existing debt—and ranked as one the largest LBOs in history.[8]

32.     The LBO debt was not sustainable once revenues to Caesars properties declined following the financial crisis. A cascade of cost cutting and financial engineering measures

_____

[7] The Uniform Prudent Investor Act, often cited by courts to construe ERISA fiduciary duties, *see, e.g., Tibble*, 575 U.S. at 529, further provides that a fiduciary who delegates investment management functions "shall exercise reasonable care, skill, and caution in: (1) selecting an agent; (2) establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and (3) periodically reviewing the agent's actions in order to monitor the agent's performance and compliance with the terms of the delegation." UPIA § 9(a), *available at* https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=22cb68ce-097b-178f-899d-320e70be214d (last visited May 18, 2021).

[8] *See In Re Caesars Entertainment Operating Company Inc.*, 15-01145 (N.D.Ill. Bankr.), Doc. 3720-5, Final Report of Examiner Richard J. Davis, vol. 5, at 757.

followed as the company's owners tried to keep control and avoid losing their equity investment to creditors.[9]

33.     The company stopped making Plan contributions in 2009 and did not resume for more than three years.[10] When the company resumed contributions, the 50% match was subject to a $600 cap per person per year.[11] Based on the Plan's regulatory filings, the effective match with the cap was only 17%-18% of employee contributions between 2013 and 2016. The median among plans with $1 billion or more in assets was 56%-58%.

34.     Prior to the LBO, the average participant balance in the Plan was in the 10th percentile of billion-dollar plans, and the effective company match was in the 24th percentile. After Caesars' suspension and cuts to the match, by the end of 2016, the average participant balance ranked in the bottom 3%, and the effective company match was in the bottom 5%.

35.     Caesars' post-LBO financial engineering also caught up with the company.[12] A number of lawsuits accusing the company and its executives (including at least one Plan Investment Committee member) of improprieties were filed in 2014. In 2015, the company put its primary operating subsidiary in bankruptcy, and accusations of wrongdoing followed the company into bankruptcy. The company settled with creditors in late 2016, and the firms that led the LBO finally lost control. A fractured Caesars, now controlled by disparate groups of creditors electing their own board members, emerged from bankruptcy in August 2017.

36.     The same month, Russell took control of the Plan's investments through its fiduciary outsourcing program. With the upheaval at the top at Caesars in the preceding years and the

---

[9] *See* Sujeet Indap, *What happens in Vegas...the messy bankruptcy of Caesars Entertainment*, FINANCIAL TIMES (Sept. 26, 2017), *available at* https://www.ft.com/content/a0ed27c6-a2d4-11e7-b797-b61809486fe2 (last visited May 18, 2021). The same reporter recently published a book that delves deeper into the case. *See* Sujeet Indap, *The Caesars Palace Coup: How a Billionaire Brawl Over the Famous Casino Exposed the Power and Greed of Wall Street* (Diversion Books 2021).
[10] Most employers did not suspend contributions during the financial crisis. *See* American Benefits Institute, *Trends in 401(k) Plans and Retirement Rewards* (Mar. 2013), at 3, (finding that around 9 out of 10 employers did not suspend contributions between 2007 and 2012), *available at* https://www.americanbenefitscouncil.org/pub/?id=e613e2a9%2Dcb3b%2Db159%2D6cff%2D69 31bd1953a6 (last visited May 18, 2021).
[11] For example, due to the $600 limit, a participant earning $50,000 per year and contributing 6% ($3,000) would receive only a 20% match ($600). The cap was raised in 2018 but not eliminated until 2019.
[12] *See Indap, supra*, n. 9.

uncertain future direction of the fractured company, meeting the exacting demands of administering an employee retirement plan was likely not a top priority. Handing control to a fiduciary outsourcing provider like Russell was an attractive option for Caesars and the Plan Investment Committee.

*Russell Overhauls the Plan's Menu*

37.   Immediately upon assuming control over the Plan's investment menu in August 2017, Russell removed all of the existing funds from the Plan's investment menu and replaced them with Russell-affiliated funds.

38.   In Russell's overhaul of the Plan, the Plan's "all-in" age-based balanced options (also known as "target date" funds[13]) were replaced with Russell's competing age-based funds. And the Plan's options devoted to particular asset classes—alternatives to the age-based funds to allow participants to customize their portfolios—were replaced with Russell-affiliated funds in the same asset classes.

39.   In addition, the Plan "re-enrolled" participants so that their accounts would be automatically invested in the default age-based option for their age group, unless they affirmatively elected to create a custom portfolio.[14]

40.   As a result of these measures, all of the Plan's assets (around $1.4 billion) were transferred (or "mapped") to Russell's proprietary funds, and approximately three-quarters of the Plan's assets (more than $1 billion) were poured into Russell's age-based funds.

*Russell's Funds Offered No Prospective Advantage Over the Plan's Prior Menu*

41.   The prior menu did not need to be thrown out. Prior to Russell, the Plan had a professional investment consultant that helped develop and monitor the Plan's investment menu. The investment options included institutionally-priced separate accounts, collective investment

---

[13] US DEP'T OF LABOR, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries* (Feb. 2013) ("TDFs offer a long-term investment strategy based on holding a mix of stocks, bonds and other investments … that automatically changes over time as the participant ages."), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf (last visited May 18, 2021).
[14] Plaintiff does not challenge the decision to re-enroll participants, only the replacement of all of the Plan's options with Russell-affiliated funds.

trusts, and mutual funds from leading investment managers routinely selected by other large defined contribution plans.

42.     The prior options also had a consistent track record of success relative to Russell's replacement funds. For example, the Plan's age-based funds managed by State Street outperformed Russell's age-based funds, on balance, over the 3- and 5-year periods leading up to the swap, as well as since the inception of each Russell fund.[15]  *See Illustration 1, infra*.

43.     The prior age-based funds achieved these superior returns at comparable, and often lower, levels of risk. The industry's standard measure of risk is the standard deviation of a fund's returns. The funds' standard deviations were comparable leading up to Russell's overhaul, with the State Street funds often exhibiting less risk.

44.     The illustration below compares the performance of State Street's age-based funds to Russell's age-based funds leading up to Russell's menu overhaul by identifying (1) the fund that outperformed over each period, (2) the excess average annual return achieved by the outperforming fund, (3) the fund that exhibited lower risk (as measured by the standard deviation of fund returns during the period), and (4) the difference between the standard deviations of the lower risk fund and the higher risk fund.

*Illustration 1: Prior Age-Based Series vs. Russell Age-Based Series As of Year-End 2016*

*2055 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.56%) | State Street (+ 0.43%) | State Street (+ 0.58%) |
| Lower Risk Fund | State Street (– 0.36%) | State Street (– 0.56%) | State Street (– 0.57%) |

*2050 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.52%) | State Street (+ 0.41%) | State Street (+ 1.29%) |
| Lower Risk Fund | State Street (– 0.33%) | State Street (– 0.54%) | State Street (– 1.05%) |

---

[15] Russell launched its age-based funds in two waves in 2007 and 2008, first funds with even-numbered anticipated retirement dates in 2007, and then odd-numbered funds in 2008. Russell then added the 2055 fund in 2011 and the 2060 fund in 2015. In the following analysis, the "Life of Russell Fund" period starts with the first full month that both  the Russell and State Street funds were in operation (for each fund except 2050, Russell launched second), as partial month returns are not available for comparison for all funds. Additionally, the 2060 fund did not have a minimum 3-year history to compare as of the end of 2016 and is therefore not included in this analysis.

*2045 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.50%) | State Street (+ 0.42%) | State Street (+ 0.98%) |
| Lower Risk Fund | State Street (− 0.30%) | State Street (− 0.49%) | State Street (− 1.03%) |

*2040 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.45%) | State Street (+ 0.33%) | State Street (+ 0.90%) |
| Lower Risk Fund | State Street (− 0.65%) | State Street (− 0.72%) | State Street (− 1.20%) |

*2035 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.44%) | Russell (+ 0.33%) | State Street (+ 0.81%) |
| Lower Risk Fund | State Street (− 0.25%) | State Street (− 0.76%) | State Street (− 1.38%) |

*2030 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.40%) | State Street (+ 0.99%) | State Street (+ 1.44%) |
| Lower Risk Fund | Russell (− 0.79%) | Russell (− 0.09%) | State Street (− 1.76%) |

*2025 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.30%) | State Street (+ 1.06%) | State Street (+ 1.42%) |
| Lower Risk Fund | Russell (− 1.54%) | Russell (− 0.93%) | State Street (− 0.06%) |

*2020 Fund*

|  | 3-Year | 5-Year | Life of Russell Fund |
|---|---|---|---|
| Higher Return Fund | State Street (+ 0.13%) | State Street (+ 1.29%) | State Street (+ 0.89%) |
| Lower Risk Fund | Russell (− 1.61%) | Russell (− 1.23%) | Russell (− 0.83%) |

45.     Faced with these results, a prudent and objective fiduciary would not have replaced the State Street age-based series with Russell's age-based series in 2017. Indeed, fiduciaries of at least 25 ERISA-covered defined contribution plans with more than $1 billion in assets retained the State Street age-based series as of the end of 2016. No such plan with more than $1 billion held Russell's age-based funds at that time.

46.     The Plan's other investment options also did not warrant replacement by Russell's funds. The prior menu included standard asset classes found in defined contribution plans and

leading investment managers. For example, the Plan included an actively managed U.S. stock fund managed by Dodge & Cox. This fund is held by more than 100 ERISA-covered defined contribution plans with more than $1 billion in assets and, as of the end of 2016, had beat its benchmark by more than 2.3% per year over the prior five years. The Plan also included passive funds managed by State Street that successfully tracked common indexes of U.S. stocks, international stocks, and bonds for many years. State Street's S&P 500 index fund, for example, is held by more than 70 ERISA-covered defined contribution plans with more than $1 billion in assets. Yet Russell liquidated all of these holdings in favor of its proprietary asset class funds—seven of nine of which were not held by any ERISA-covered defined contribution plan with more than $1 billion in assets at the end of 2016. The other two were held by three or fewer such plans.

*Russell Needed an Infusion of Assets at a Difficult Time for the Funds*

47.    Russell's performance struggles did not go unnoticed by other plan fiduciaries. After hitting a high mark around 2013, Russell started to lose investors in its age-based funds, and assets in the funds started to decline. Between year-end 2013 and year-end 2016, the funds' reported assets decreased by 20%, even as the underlying investments returned an average of 3%-4% per year. The 20% drop represented significant net outflows from investors—including Russell's own employee plan. Russell withdrew around $130 million of its own plan assets from the funds in 2016.

48.    During 2017, four additional fiduciaries, representing twelve plans with over $450 million invested in Russell's age-based funds, pulled their investments. These fiduciaries represented nearly half of the funds' remaining investors at year-end 2016, and more than one-third of the funds' reported assets.[16] Russell was likely aware of these completed or impending redemptions as it prepared to take over the Plan's menu in 2017.

49.    Maintaining asset levels is critical for fund managers.  Managers charge fees and expenses as a percentage of the assets in the fund, so a fund's size determines the expense ratio that the manager can offer in the marketplace. A decline in assets means that a fund must charge higher

---

[16] There were six other fiduciaries, representing eleven plans, that held Russell's age-based funds as of year-end 2016. Two of the six, representing six plans, removed Russell's age-based funds in 2018 and 2019. *See infra*, ¶ 56.

fees or reduce services to maintain the same level of profitability for the manager, or alternatively, the fund manager must subsidize the fund and accept a lower level of profits. Further, a competitive marketplace for fees leaves little room for managers to raise fees.[17] A material drop in assets therefore poses significant risks to the survival of a fund.

50.     Scale is especially critical for Russell's age-based funds. Russell's age-based funds are composed of a dozen underlying Russell funds. Therefore, a drop in assets in the Russell age-based funds also reduces assets in a dozen other proprietary funds.

51.     The Plan's assets offered a life preserver to Russell when Russell took over the Plan's menu amid the rash of redemptions in its age-based funds in 2017. Without $1 billion in new investment in its age-based funds from the Plan, Russell would have suffered a further 25% decrease in reported assets in the funds by year-end 2017 (even after accounting for appreciation during the year). But by moving the Plan to its age-based funds, Russell (1) prevented another material decline, (2) doubled assets in the funds compared to their year-end position without the Plan, and (3) returned to 2013 asset levels. Thus, while the swap could not be justified based on prospective returns for participants, see *supra*, the change significantly benefitted Russell.

### Russell's Self-Serving Swap Has Cost the Plan More than $100 Million

52.     Russell's funds have continued to underperform since they were adopted for the Plan. As of the end of 2020, average annual returns of Russell's age-based funds still lagged the State Street funds over the prior 3- and 5-year periods. The funds also lagged a standard industry benchmark, the S&P Target Date indexes, over the same periods.

*Illustration 2: Prior Age-Based Funds vs. Russell Age-Based Funds vs. S&P TDF Indexes As of Year-End 2020*

*2060 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 11.02% | 12.57% |
| S&P Target Date Index | 9.38% | 11.71% |
| Russell | 7.61% | 10.12% |

---

[17] *See* CALLAN INSTITUTE, 2019 Investment Management Fee Study ("[S]ustained downward pressure on both fee schedules and mandate sizes results in significantly lower dollar fees paid (manager revenue) per client."), *available at* https://www.callan.com/uploads/2020/05/0ce3d1da04c2c1d8e13a30a67dbdfabe/callan-2019-im-fee-study.pdf (last visited May 18, 2021).

*2055 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 11.02% | 12.57% |
| S&P Target Date Index | 9.26% | 11.55% |
| Russell | 7.54% | 10.12% |

*2050 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 11.04% | 12.58% |
| S&P Target Date Index | 9.24% | 11.44% |
| Russell | 7.60% | 10.15% |

*2045 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 10.87% | 12.48% |
| S&P Target Date Index | 9.15% | 11.24% |
| Russell | 7.50% | 10.11% |

*2040 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 10.69% | 12.13% |
| S&P Target Date Index | 9.00% | 10.95% |
| Russell | 7.40% | 10.06% |

*2035 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 10.45% | 11.71% |
| S&P Target Date Index | 8.67% | 10.47% |
| Russell | 7.53% | 9.42% |

*2030 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 10.08% | 11.16% |
| S&P Target Date Index | 8.19% | 9.77% |
| Russell | 7.34% | 8.65% |

*2025 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 8.98% | 10.15% |
| S&P Target Date Index | 7.73% | 9.08% |
| Russell | 6.99% | 7.82% |

15

*2020 Fund*

|  | 3-Year | 5-Year |
|---|---|---|
| State Street | 6.02% | 7.34% |
| S&P Target Date Index | 5.83% | 7.59% |
| Russell | 5.08% | 6.21% |

53.     Russell yielded these deficient results—often underperforming the Plan's prior funds by 2-3% per year and the S&P Target Date indexes by more than 1% per year—while taking on comparable and often higher levels of risk. Indeed, over each period, Russell's 2035, 2040, 2045, 2050, 2055, and 2060 funds exhibited higher risk (as measured by the standard deviation of returns) than the State Street funds or the S&P Target Date index.

54.     Since the swap, the funds associated with each asset class in the prior menu have also outperformed, as a weighted composite, the comparable Russell fund in the same asset classes.

55.     The consequences for participants have been severe. The Plan has lost more than $100 million in investment returns due to Russell's replacement of the prior menu with its own poorly performing proprietary funds. Yet, Russell has stubbornly retained these proprietary funds in the Plan, contrary to its ongoing fiduciary duty to monitor the funds (and to remove these imprudent funds under the circumstances here).

56.     In the meantime, two additional fiduciaries representing six plans pulled their investments from Russell's age-based funds in 2018 and 2019. This left the Plan holding a critical 74% of the reported assets in Russell's age-based funds as of the end of 2019. Russell's subordination of participants' interests to its own business interests through retention of its underperforming funds constitutes a further breach of Russell's fiduciary duties to the Plan.

*The Caesars Defendants Failed to Prudently Review and Monitor Appointed Fiduciaries*

57.     Although outsourcing fiduciary control of an investment menu is not a breach standing alone, the Caesars Defendants had fiduciary duties to prudently appoint and monitor other Plan fiduciaries.

58.     Based on Russell's conflict of interest in selecting its own funds, the inferior track record of Russell's funds relative to the Plan's existing menu, Russell's decision to immediately swap all Plan funds for proprietary funds, the ongoing underperformance of the Russell funds, and

1    the Plan Investment Committee's lack of subsequent intervention, it does not appear that the Plan

2    Investment Committee prudently reviewed Russell's investment plan prior to retaining Russell or

3    prudently surveyed Russell's actions after Russell assumed control. Nor does it appear that Caesars

4    prudently monitored the Plan Investment Committee after Caesars executed the Plan Investment

5    Committee's agreement with Russell. Caesars was on notice that the Plan Investment Committee

6    had outsourced its duties to Russell, and Caesars did not intervene once the Plan Investment

7    Committee allowed Russell to take wholly self-serving actions not supported by the interest of the

8    Plan. As losses piled up, the Plan Investment Committee should have monitored Russell's ongoing

9    poor results and removed Russell, and the 401(k) Plan Committee has a continuing obligation to

10   do the same.  Meanwhile, Caesars should have monitored the Plan's situation and taken necessary

11   action to secure the interest of participants, to the extent that the Plan Investment Committee and

12   401(k) Plan Committee failed to prudently monitor or remove Russell. In all of these respects, the

13   Caesars Defendants failed to live up to their fiduciary obligations.

14                    *Plaintiff Lacked Knowledge of Defendants' Fiduciary Misconduct*

15        59.    Plaintiff did not have knowledge of all material facts necessary to understand that

16   Defendants breached their fiduciary duties until shortly before this suit was filed. Further, Plaintiff

17   did not have actual knowledge of the specifics of Defendants' decision-making and monitoring

18   processes with respect to the Plan, because this information is solely within the possession of

19   Defendants prior to discovery. For purposes of this First Amended Complaint, Plaintiff has drawn

20   reasonable inferences regarding these processes based upon (among other things) the facts set forth

21   herein.

22                              **CLASS ACTION ALLEGATIONS**

23        60.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring

24   an action individually on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a).

25   Plaintiff seeks certification of this action as a class action pursuant to these statutory provisions and

26   Fed. R. Civ. P. 23.

27

28

61.     Plaintiff asserts his claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[18]

> All participants and beneficiaries of the Plan at any time on or after August 1, 2017, excluding any employees of Caesars with responsibility for the Plan's investment or administrative functions.

62.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. During the putative class period, the Plan had over 40,000 participants.

63.     <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff participated in the Plan, was invested in Russell funds, and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistent with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Class members similarly.

64.     <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that she seeks to represent, and she has retained counsel experienced in complex class action litigation, including ERISA class action litigation. Plaintiff does not have any conflict of interest with any Class members that would impair or impede her ability to represent other Class members.

65.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a)  Whether Defendants are fiduciaries of the Plan, and the scope of their fiduciary duties;

b)  Whether the Plan's fiduciaries breached their fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

c)  The proper form of equitable and injunctive relief; and

d)  The proper measure of monetary relief.

66.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying

---

[18] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

67. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests.

68. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this First Amended Complaint applied uniformly to all Class members. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## <u>COUNT I</u>
### Breach of Duties of Loyalty and Prudence Against Defendant Russell

69. Plaintiff repeats and re-alleges Paragraphs 1 through 68 of the First Amended Complaint as though fully set forth herein.

70. Defendant Russell is and was a fiduciary of the Plan under 29 U.S.C. § 1002(21) and 29 U.S.C. § 1002(38).

71. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants in their selection and monitoring of investment funds for the Plan's investment menu. The relevant statute, 29 U.S.C. § 1104(a)(1), provides:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)    for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan; [and]

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

72.    These fiduciary duties are continuing in nature, and apply to both the selection of investments for the Plan and the subsequent monitoring, retention, removal, and replacement of those investment options. *See Tibble*, 135 S. Ct. at 1828.

73.    Russell breached its fiduciary duties by replacing all of the Plan's investments with inferior proprietary funds. This was neither prudent nor in the interest of Plan participants and beneficiaries. Russell further breached its fiduciary duties by retaining its inferior proprietary funds in the Plan's investment menu.

74.    Russell's fiduciary breaches resulted in significant losses to the Plan, and Russell is liable for these losses under 29 U.S.C. §§ 1109(a) and 1132(a)(2).

75.    In addition, Russell is liable for other appropriate relief, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2), and reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g).

## COUNT II
**Breach of the Duty of Prudence, including Failure to Monitor Appointed Fiduciaries, Against the Caesars Defendants**

76.    Plaintiff repeats and re-alleges Paragraphs 1 through 75 of the First Amended Complaint as though fully set forth herein.

77.    Defendant Caesars is and was a fiduciary of the Plan under 29 U.S.C. § 1002(21). The Plan Investment Committee was also a fiduciary of the Plan under 29 U.S.C. § 1002(21) until it was replaced by the 401(k) Plan Committee on or after July 20, 2020. The 401(k) Plan Committee

1    has been a fiduciary of the Plan under 29 U.S.C. § 1002(21) since it succeeded to the duties of the

2    Plan Investment Committee on or after July 20, 2020.

3          78.     The Caesars Defendants had, and have, fiduciary duties to act prudently in the

4    process of appointing other persons to fiduciary positions and monitoring their performance. The

5    Caesars Defendants were obligated to take prompt and effective action to protect the Plan and its

6    participants and beneficiaries from Russell's imprudent and self-serving actions.

7          79.     Caesars breached its fiduciary duties by, among other things:

8            a)    Failing to appropriately monitor and evaluate the Plan Investment Committee or

9                401(k) Plan Committee or have a system in place for doing so;

10           b)    Acknowledging the Plan Investment Committee's appointment of Russell and

11               then failing to take any action when the Investment Committee allowed Russell

12               to make wholly self-serving and imprudent changes to the Plan investment

13               menu; and

14           c)    Failing to take action when the Plan Investment Committee and 401(k) Plan

15               Committee continued to retain Russell despite Russell's ongoing self-serving

16               and imprudent management of the Plan.

17          80.     The Plan Investment Committee breached its fiduciary duties by, among other

18    things:

19           a)    Failing to prudently survey Russell's investment plan prior to outsourcing

20               fiduciary investment duties to Russell;

21           b)    Failing to prudently review Russell's actions after Russell immediately

22               eliminated the entire Plan investment menu in favor of Russell's propriety funds;

23           c)    Failing to appropriately monitor and evaluate Russell on an ongoing basis or

24               have a system in place for doing so; and

25           d)    Failing to remove Russell despite Russell's ongoing self-serving and imprudent

26               management of the Plan.

27          81.     The 401(k) Plan Committee breached its fiduciary duties by, among other things:

28           a)       Failing to appropriately monitor and evaluate Russell after succeeding to

the fiduciary duties of the Plan Investment Committee;

        b)    Failing to remove Russell despite Russell's ongoing self-serving and imprudent management of the Plan.

82.    As a consequence of the foregoing breaches of fiduciary duty, the Plan suffered significant losses.

83.    The Caesars Defendants are liable for these losses and other appropriate relief as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) on account of their failures to prudently appoint and monitor their fiduciary appointees.

84.    The Caesars Defendants are also liable to the Plan as co-fiduciaries under 29 U.S.C. § 1105(a). Based on the circumstances of Russell's engagement, Russell's overhaul of the Plan's investment menu with poorly performing Russell funds, and Russell's subsequent retention of those funds, the Caesars Defendants enabled Russell's imprudent and self-serving conduct by failing in their own duties to prudently select and/or monitor fiduciaries on behalf of the Plan. The Plan Investment Committee and 401(k) Plan Committee had knowledge of Russell's self-serving and imprudent conduct, and failed to take reasonable steps to remedy Russell's breaches. Caesars also had knowledge of the Plan Investment Committee's imprudence in appointing and retaining Russell, yet Caesars took no apparent action to cause the Plan Investment Committee or 401(k) Plan Committee to cure their breaches. Accordingly, in addition to being directly liable for the foregoing breaches, the Caesars Defendants are also derivatively liable to the Plan for the breaches of their co-fiduciary Russell under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, as the Class representative, and on behalf of the Plan, prays for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F. Other equitable relief to redress Defendants' practices and to enforce the provisions of ERISA as may be appropriate, including modification of the Plan's investment lineup, removal of Plan fiduciaries deemed to have breached their fiduciary duties, and/or appointment of independent fiduciaries;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I. An award of such other and further relief as the Court deems equitable and just.

Dated: July 30, 2021                    /s/ Kai Richter

NICHOLS KASTER, PLLP
Paul J. Lukas, MN Bar No. 22084X*
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Ben Bauer, MN Bar No. 0398853*
4700 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
bbauer@nka.com
* LR IA 11-2 petition approved

Paul S. Padda
NV Bar No. 10417
PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, NV 89103
Tel: (702) 366- 1888
psp@paulpaddalaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS