UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Maggie Thomson; Juan Duarte,

               Plaintiffs

   v.

Caesars Holdings Inc., et al.,

               Defendants

Case No. 2:21-cv-00961-CDS-BNW

**Order Denying RITC's Motion to Dismiss, Granting in Part and Denying in Part the Caesars Defendants' Motion to Dismiss, and Granting Plaintiff Leave to File Supplemental Authority**

[ECF Nos. 65, 66, 103]

Caesars Holdings Inc.[1] sponsors a 401(k) plan, called the Caesars Entertainment Corporation Savings & Retirement Plan (the Plan), for its eligible employees. In this Employee Retirement Income Security Act (ERISA) suit, plaintiffs Maggie Thomson and Juan Duarte, as representatives of a prospective class of Caesars affiliates and on behalf of the Plan, sue defendants Caesars Holdings Inc., the Plan Investment Committee, the 401(k) Plan Committee (collectively, the "Caesars defendants"), and Russell Investments Trust Company (RITC) for alleged breaches of fiduciary duty that cost Plan participants more than $100 million in potential investment earnings to date. Such losses allegedly stem from: (1) the Caesars defendants' 2017 decision to switch to RITC for managing the Plan's assets, (2) RITC's decision to move the Plan's assets from investment funds run by non-parties into RITC's own proprietary funds, (3) RITC's proprietary funds underperforming relative to the other investment funds, and (4) the Caesars defendants' inaction by failing to remove RITC when the Plan underperformed. The

---

[1] Caesars Holdings Inc. was formerly known as Caesars Entertainment Corporation prior to late 2020, when Eldorado Resorts, Inc. purchased Caesars and reorganized the company. Compl., ECF No. 50 at 3. The parties interchangeably refer to "Caesars Holdings Inc." and "Caesars Entertainment Corporation," but I construe both as referring to the same entity.

Caesars defendants and RITC move to dismiss plaintiffs' complaint. And the plaintiffs seek leave to file supplemental authority related to the motions to dismiss, a request that none of the defendants oppose.

## I.   Relevant background information

### a.   Procedural history

Plaintiffs filed this lawsuit on May 19, 2021. Compl., ECF No. 1. They voluntarily amended their first two complaints, so the operative complaint is currently the Second-Amended Complaint (SAC). ECF No. 50. RITC and the Caesars defendants filed separate motions to dismiss the SAC on October 20, 2021. ECF Nos. 65, 66. Plaintiffs responded on November 19, 2021, and defendants replied on December 10, 2021. ECF Nos. 72, 73, 75, 76. The case was administratively reassigned to me on April 13, 2022. ECF No. 88. Because the motions to dismiss were filed and briefed more than a year ago, I found good cause to grant both parties leave to file supplemental authority. Order, ECF No. 100; Def's First Br., ECF No. 82; Pl's First Br., ECF No. 83; Def's Second Br., ECF No. 98. I also held a hearing in December 2022 to allow the parties to present oral argument on the motions to dismiss. Hr'g Tr., ECF No. 108. Following that hearing, plaintiffs now seek leave to file a second supplemental brief. ECF No. 103. Defendants do not oppose plaintiffs' motion, but they argue that the supplemental authority on which plaintiffs rely does not help to resolve the motions to dismiss. ECF Nos. 104, 105.

### b.   Factual background[2]

#### i.   Plaintiffs

Plaintiffs Maggie Thomson and Juan Duarte are Illinois residents and current participants in the Plan. ECF No. 50 at 3. Thomson began participating in 2014 and Duarte in 1994. *Id.* Both plaintiffs' Plan accounts were invested in State Street age-based funds for their

---

[2] For the purposes of ruling on the motions to dismiss, I "assume [the] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). My factual summary thus takes plaintiffs' well-pled factual allegations as true.

respective age groups until 2017, when RITC removed all non-RITC options and moved Plan funds into RITC age-based funds. *Id.* Thomson's account was transferred into RITC's 2055 Strategy Fund, while Duarte's account was transferred into RITC's 2040 Strategy Fund. *Id.* Duarte has since rebalanced his account using standalone (non-age-based) funds in the Plan but has only had RITC funds as options. *Id.* Both plaintiffs allege that their accounts would be worth more today if defendants had not breached their fiduciary duties. *Id.*

    ii. *Caesars defendants*

  Caesars Holdings, Inc. is a holding company that owns gaming, entertainment, and hospitality operations worldwide. *Id.* Caesars's board of directors (or a committee acting on the board's behalf) created the Plan Investment Committee and appointed individuals thereto to select, monitor, and remove Plan investments. *Id.* at 4. The board also authorized the Plan Investment Committee to outsource its investment duties to an "investment manager" under the procedure established by ERISA § 3(38). *Id.* The Plan Investment Committee was dissolved and replaced by the 401(k) Plan Committee around July 20, 2020. *Id.* The 401(k) Plan Committee was created by Caesars to take over the investment duties of the Plan Investment Committee. *Id.* Caesars appoints employees of Caesars or its affiliates to serve on the 401(k) Plan Committee. *Id.*

    iii. *RITC*

  RITC is a non-depository trust company based in Seattle which offers fiduciary investment services, including retirement plans, to institutional investors. *Id.* It offers "fiduciary outsourcing" to defined contribution retirement plans. *Id.* Through that service, RITC takes control of plan investment menus from plan sponsors. *Id.* It also manages proprietary collective trust funds, which it offers as investment options to the defined contribution retirement plans. *Id.* RITC uses its own judgment and proprietary investment processes at multiple levels in managing its funds. *Id.*

*iv.  The Plan*

The Plan was established in 1990 by Harrah's Entertainment Inc. as a tax-deferred vehicle to help Harrah's employees save for retirement. *Id.* at 5. Harrah's grew over the years, purchasing other properties, including Caesars Palace. *Id.* It struggled in the run-up to the financial crisis of 2008, resulting in a leveraged buyout of the Harrah's/Caesars empire by private equity firms. ECF No. 73 at 9. In 2010, the company's owners renamed the Plan and the Plan's sponsor, replacing "Harrah's" with "Caesars" on company branding. ECF No. 50 at 5. The Plan's current participants include current and former employees of Caesars. *Id.*

The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution" or "individual account" plan within the meaning of 29 U.S.C. § 1002(34). The Plan is also an "ERISA section 404(c) plan," meaning that participants may choose amongst investment options ("designated investment alternatives") made available by the Plan's fiduciaries. *Id.* The set of options may be described, somewhat appetizingly, as an "investment menu." *Id.* The defined contribution plan provides retirement benefits to participants that are "limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Id.* (quoting *Tibble v. Edison Int'l.*, 575 U.S. 523, 525 (2015)). Thus, the investment options made available by the Plan's fiduciaries are critical to participants' retirement outcomes. *Id.*

Defendants are fiduciaries of the Plan. *Id.* at 6. Caesars is a fiduciary because it appointed members of the Plan Investment Committee and 401(k) Plan Committee and has authority to remove those members. *Id.* The authority to appoint and remove other fiduciaries constitutes "discretionary authority or discretionary control respecting management of [a] plan" and confers fiduciary status under ERISA. *Id.* (citing 29 U.S.C. § 1002(21)(A)(i)). The Plan Investment Committee and 401(k) Plan Committee are fiduciaries because they respectively had and have authority to select and remove investments for the Plan, as well as the authority to outsource their investment duties to an "investment manager" under ERISA § 3(38). *Id.* Authority to select

and remove investments comprises "any authority or control respecting management or disposition of assets" and confers fiduciary status under ERISA. *Id.* (citing 29 U.S.C. § 1002(21)(A)(i)). Also, authority to appoint and remove investment managers under ERISA § 3(38) constitutes "discretionary authority or discretionary control respecting management of [a] plan" and likewise confers fiduciary status under ERISA. *Id.* (citing 29 U.S.C. § 1002(21)(A)(i)).

In December 2016, the Plan Investment Committee hired RITC as its fiduciary outsourcing partner. *Id.* Caesars knew of RITC's appointment and executed an engagement agreement with RITC. *Id.* RITC assumed control of the Plan's investment menu in August 2017. *Id.* Since then, RITC has exercised authority to "manage, acquire, or dispose of any asset" of the Plan, including the authority to select and remove investment options for the Plan. *Id.* That authority is both "authority or control respecting management or disposition of assets" and "discretionary authority or discretionary control respecting management of [a] Plan," thus conferring fiduciary status under ERISA. *Id.* (citing 29 U.S.C. § 1002(21)(A)(i)). RITC acknowledged in writing that it was—at times relevant to this litigation—a fiduciary to the Plan. *Id.*

At the end of 2016, the Plan had approximately 39,000 participants with account balances, totaling $1.4 billion in assets. *Id.* It offered a diversified investment menu that Caesars and the Plan Investment Committee curated and monitored with the assistance of a professional investment consultant. *Id.* at 6–7. The menu options included separately managed accounts and collective investment trusts across a range of asset classes, including "all-in" balanced funds tailored to a participant's age, that were managed by non-party State Street. *Id.* at 7.

When RITC assumed control of the Plan's investment menu in 2017, it replaced all of the Plan's investment options with its own proprietary collective investment trusts. *Id.* At the end of 2019, the Plan had approximately 42,000 participants and $1.6 billion in assets. *Id.* RITC-affiliated funds continued to constitute 100% of the Plan's investment options. *Id.* Around 75% of

1  the Plan's assets were invested in RITC's age-based funds. *Id.*

2                    *v.   Events leading to this litigation*

3          Plaintiffs contend that Caesars outsourced control of administering its employee

4  retirement plan in the wake of the leveraged buyout of Caesars and resulting fractured

5  leadership. *Id.* at 9–10. RITC obtained control over the Plan's investment menu in August 2017

6  and immediately replaced all of the existing fund options with RITC-affiliated funds. *Id.* at 10.

7  RITC replaced the Plan's prior "all-in" age-based options (a/k/a "target date funds" or "TDFs")

8  with RITC's own age-based funds and replaced the Plan's prior asset-class options with RITC's

9  own similar asset-class options. *Id.* at 10–11.

10         The Plan's prior options "had a consistent track record of success relative to [RITC's]

11 replacement funds." *Id.* at 11. The Plan's age-based funds managed by State Street outperformed

12 RITC's age-based funds over the three- and five-year periods leading up to the swap, as well as

13 since the inception of each RITC fund. *Id.*; *see also* Illustration 1, ECF No. 50 at 2–3 (comparing

14 State Street and RITC's fund performance for each five-year target-date interval between 2020

15 and 2055, inclusive). The State Street funds also generally demonstrated lower risk volatility

16 than the RITC funds, as measured by the standard deviations of the funds' returns. *Id.*

17 Consequently, plaintiffs allege that "a prudent and objective fiduciary would not have replaced

18 the State Street age-based series with [RITC's] age-based series in 2017." *Id.* at 13. They note that

19 "at least 25 ERISA-covered defined contribution plans with more than $1 billion in assets

20 retained the State Street age-based series at the end of 2016. No such plan with more than $1

21 billion [in assets] held [RITC's] age-based funds at that time." *Id.* The Plan's asset-class funds,

22 including an actively managed fund offered by Dodge & Cox or passive funds managed by State

23 Street, were also liquidated in favor of RITC's proprietary asset-class funds. *Id.* Plaintiffs allege

24 that no prudent and objective fiduciary would have undergone the wholesale swap to RITC

25 asset-class funds either. *Id.* at 14.

26

Plaintiffs allege that RITC replaced the Plan's investment menu with RITC's proprietary funds because RITC required a cash infusion. *Id.* RITC began to lose investors in its age-based funds in 2013, reporting a 20% decrease in assets managed between the end of 2013 and the end of 2016, despite generally favorable returns on investment of three to four percent per year. *Id.* RITC even withdrew approximately $130 million of its own employee plan assets from its age-based funds in 2016. *Id.* During 2017, four more non-party fiduciaries withdrew more than $450 million combined from RITC's age-based funds. *Id.* Ultimately, by moving the Plan to RITC's age-based funds in 2017, RITC prevented a material decline in the amount of assets under its management—the Plan's funds represented a doubling of assets in RITC's funds. *Id.* at 15. Consequently, plaintiffs allege that RITC's decision to swap the Plan's assets significantly benefitted RITC while being unjustifiable based on the funds' performance. *Id.*

Ultimately, plaintiffs argue that RITC's decision to change the investment menu cost the Plan more than $100 million, based on a comparison from 2017 through 2020 between the RITC funds and comparable prior options. *Id.* at 15–17. RITC "often underperform[ed] the Plan's prior funds by 2-3%/year and the S&P Target Date indexes by more than 1%/year" while accepting similar or higher levels of risk. *Id.* at 17. RITC's funds have missed RITC's own internal benchmarks over the same timespan as well. *Id.* at 18. All the while, two more non-party fiduciaries representing six other plans pulled their investments from RITC's age-based funds in 2018 and 2019, such that the Plan constituted 74% of the reported assets in RITC's age-based funds at the end of 2019. *Id.*

Plaintiffs contend that the Caesars defendants failed to adequately review and monitor RITC's decisions, resulting in breaches of their fiduciary duties. *Id.* at 19. Plaintiffs allege that they could not have monitored RITC's decisions themselves, as they "did not have knowledge of all material facts necessary to understand" that the Caesars defendants allegedly breached their fiduciary duties. *Id.*

Now, plaintiffs sue on behalf of a proposed class of "participants and beneficiaries of the Plan at any time on or after August 1, 2017, excluding any employees of Caesars with responsibility for the Plan's investment or administrative functions." *Id.* at 20. They allege that there are more than 40,000 putative class members. *Id.* Plaintiffs bring claims against (1) RITC for breaches of the duties of loyalty and prudence and (2) the Caesars defendants for breaching the duty of prudence. *Id.* at 22–25. They request declaratory relief, an order compelling defendants to remedy the financial losses sustained by the Plan, and permanent injunctive relief prohibiting defendants from committing further ERISA violations. *Id.* at 25.

## II.  Motion for leave to file supplemental authority [ECF No. 103]

Plaintiffs move for leave to file supplemental authority. ECF No. 103. Specifically, their proposed supplemental authority bears on issues relevant to the pending motions to dismiss and concerns an order recently issued in a different case. *Id.* at 1–2. No defendant opposes plaintiffs' motion. *See* Caesars Defs' Br., ECF No. 104 at 2 (stating that the Caesars defendants do not object to the motion as long as I consider their response addressing plaintiffs' proffered supplemental authority); RITC's Br., ECF No. 105 at 1 (same).

The local rules of this district require parties to obtain leave of court before filing supplemental authority. LR 7-2(g). I may grant such a request for "good cause." *Id.* "Good cause may exist either when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." *Alps Prop. & Cas. Ins. Co. v. Kalicki Collier LLP*, 526 F. Supp. 3d 805, 812 (D. Nev. 2021) (citing *Hunt v. Washoe Cnty. Sch. Dist.*, 2019 WL 4262510, at *3 (D. Nev. Sept. 9, 2019)).

I find that good cause exists for plaintiffs to file their proffered supplemental authority. The motions to dismiss have been pending for more than a year, so recent developments in ERISA case law were not available to the parties when they originally briefed the motions to dismiss. Indeed, I have already granted defendants the opportunity to file supplemental authority on that same basis. *See* Order, ECF No. 100 (granting the Caesars defendants' motion

for leave to file supplemental authority at ECF No. 98 and permitting plaintiffs to take leave to file their own supplemental authority). Because plaintiffs' motion satisfies the local rules concerning supplemental authority and because the proffered authority may prove helpful in resolving the motions to dismiss, I grant the plaintiffs' motion.

## III.   Motions to dismiss

### a.   Legal standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Under Rule 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the non-movant. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

I may consider both motions to dismiss together. *See, e.g., Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 464 (N.D. Cal. 2017) (considering both defendants' motions to dismiss together in an ERISA action). Because plaintiffs' claims against the Caesars defendants derive from their claims against RITC, I address RITC's alleged breach first.[3]

---

[3] The Caesars defendants note that their liability is, in many ways, premised on RITC's liability, and the briefing between them and plaintiffs thus recapitulates many of the same arguments regarding RITC's liability. *See, e.g.*, ECF No. 66 at 10–14 (Caesars defendants' motion to dismiss argues that plaintiffs have not stated plausible claims against RITC); ECF No. 75 at 7–10 (same but via reply brief). Because I find that plaintiffs have stated plausible claims against RITC, I need not address the Caesars defendants' arguments regarding RITC's underlying breaches except to the extent that the Caesars defendants add novel argument.

b. *Plaintiffs plausibly allege that RITC breached the duties of loyalty and prudence.*

ERISA is designed to "protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators," and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985). To this end, Congress has mandated that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries. 29 U.S.C. § 1003(a); § 1102(a)(1). Moreover, the authority to administer the plan must be vested in one or more named fiduciaries. *Id.* § 1102(a)(1). The fiduciary need not be an independent party; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. *Id.* § 1108(c)(3). Here, plaintiffs allege that the Caesars defendants, as plaintiffs' employer and the Plan sponsor, appointed RITC to serve in a fiduciary capacity and vested in RITC the authority to administer the Plan. ECF No. 50 at 22. Thus, RITC was bound to fulfill its duties in accordance with ERISA and subject to its mandates.

Section 1104(a)(1) of ERISA imposes three general duties on pension plan fiduciaries. They "must 1) discharge their duties with 'prudence'; 2) diversify investments to 'minimize the risk of large losses'; and 3) act 'solely in the interest of the participants' and for the 'exclusive purpose' of providing benefits to those participants." *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1093–94 (9th Cir. 2004) (quoting 29 U.S.C. § 1104(a)(1)). While plaintiffs do not allege that RITC failed to diversify its investments, the other two fiduciary duties—prudence and loyalty—are implicated by the SAC. ECF No. 50 at 22. Those two duties are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (internal quotation marks and citation omitted). Plaintiffs allege that RITC breached its duties of loyalty and prudence by replacing all of the Plan's investments with "inferior proprietary funds"[4] and retaining those

---

[4] RITC objects to its funds being labeled "proprietary," as it argues that the term is "conclusory, misleading, and irrelevant." ECF No. 65 at 13:15–17. When referring to a product, such as the products-in-

funds even after they resulted in "significant losses to the Plan[.]"[5] ECF No. 50 at 22–23.

  *i. Plaintiffs sufficiently plead that RITC breached its duty of loyalty.*

   Under ERISA, plan fiduciaries must act "solely in the interest of [Plan] participants" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1). Plaintiffs allege that RITC breached its duty of loyalty by replacing the prior Plan options with a Plan menu exclusively composed of RITC's own funds, which gave RITC "more than 'incidental benefit[s].'" ECF No. 72 at 23. RITC moves to dismiss plaintiffs' claim because ERISA does not per se prohibit proprietary funds and because plaintiffs speculate as to the benefits that RITC accrued. ECF No. 65 at 13–16. Plaintiffs respond that they have adequately pled their claims against RITC and that RITC has attempted to elevate the pleading standards beyond what is required at the dismissal stage of an ERISA suit. *See generally* ECF No. 72.

   I find that plaintiffs sufficiently plead a breach of RITC's duty of loyalty. "To state a claim of disloyalty, a plaintiff must allege plausible facts supporting an inference that the defendant acted for the purpose of providing benefits to itself or someone else." *Global Invs. U.S.*

---

suit offered by RITC, the term "proprietary" simply means "sold under a tradename." Proprietary, Black's Law Dictionary (11th ed. 2019). To the extent that RITC contends that it did not sell the challenged funds under a tradename, that dispute may best be resolved at the summary-judgment stage. And to the extent that RITC contends that its funds are not proprietary because a variety of unaffiliated sub-advisors select the strategies used within the target-date funds, RITC packages the collective strategies under its own branding. *See, e.g.*, RITC's TDF Fact Sheets, Ex. H, ECF No. 65-9 at 2–3. Setting the hairsplitting of nomenclature aside, I use the term "proprietary" throughout this order in reference to RITC's investment menu to recognize that the only investment options RITC offered to the Plan were options ultimately managed, even if only at a high level, by RITC.

[5] Plaintiffs' allegations against RITC for breaches of the duties of loyalty and prudence are comingled in the SAC. ECF No. 50 at 22–23. RITC identifies this "improper[] collaps[ing]" of claims, albeit for the first time, in its reply brief. ECF No. 76 at 6. That said, the federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). This is especially true here given the overlapping nature of the duties of loyalty and prudence. For the most part, the underlying behavior giving rise to plaintiffs' causes of action overlaps; for example, plaintiffs contend that RITC's decision to select its own funds for the Plan evinces a breach of both duties. ECF No. 72 at 11 (prudence), 19–21 (loyalty). In resolving this motion to dismiss, however, I address the alleged breaches of the two duties separately.

*LLC Alpha Series Litig.*, 2021 WL 4481215, at *24 (S.D.N.Y. Sept. 30, 2021) (internal quotation marks and citation omitted). The duty of loyalty prevents fiduciaries from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069 (N.D. Cal. 2017) (quoting Restatement (Third) of Trusts § 78 (2007)). Other courts in the Ninth Circuit have denied motions to dismiss when plaintiffs have sufficiently alleged that defendants made investment management decisions to benefit the plan sponsor at the expense of the plan participants. *See, e.g., John v. Providence Health & Servs.*, 2018 WL 1427421, at *8–9 (W.D. Wash. Mar. 22, 2018). Similarly, plaintiffs in the instant case plead enough factual allegations to demonstrate that RITC could have operated with the purpose of benefiting itself.

First, plaintiffs allege that because RITC implemented a Plan menu comprised entirely of RITC's own fund options, RITC gave an improper preference to its own proprietary funds without considering alternative funds. ECF No. 72 at 19. And, plaintiffs contend, RITC did so because the investment company "needed an infusion of assets at a difficult time for the funds." ECF No. 50 at 14. Between 2013 and 2017—the years leading up to the Caesars defendants' decision to switch to RITC for Plan investment strategy—the challenged funds' reported assets decreased year-over-year with a heightened exodus of investors in 2017. *Id.* Plaintiffs allege that, because "[s]cale is especially critical for [RITC's] age-based funds[,]" the Plan's assets "offered a life preserver" to RITC, as RITC would have suffered another decrease in reported assets during 2017 if not for the Caesars' defendants decision to switch. *Id.* at 15.

RITC counters that it was paid a flat fee by the Caesars defendants regardless of which investment options it selected for the Plan menu, meaning that it was not pressured by a conflicting interest to select its own funds. ECF No. 65 at 12–13. Specifically, RITC contends that each RITC fund selected for the Plan was a "fund-of-funds" wherein RITC "receive[d] no fees" from the challenged menu options. ECF No. 76 at 4–5. It attaches the Investment

Management Agreement (IMA) to its motion as evidence of the fee structure.[6] *See* Ex. F, ECF No. 65-7 at 16 (stating that the "fee will not vary based on the allocation of participant assets, investment funds chosen, [and] sub-advisors employed . . ."). RITC concludes that any benefits that it may have enjoyed as a result of Plan management were "incidental." ECF No. 65 at 15.

Although plaintiffs cannot identify at this stage exactly how RITC benefited from taking over operation of the Plan, they have sufficiently alleged that RITC could have potentially acted, at least in part, based on its own self-interest. "To enforce [the duty of loyalty], the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (internal citation omitted). "When it is possible to question the fiduciaries' loyalty, they are obliged **at a minimum** to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Id.* at 1488–89 (citing *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)).

RITC may not have received direct compensation from the Caesars defendants for selecting its own funds, but plaintiffs paint a compelling picture of an investment company in dire need of a cash transfusion to prop up its own investment lineup while other investors fled. ECF No. 50 at 14–15. And such allegations are all that is required at this stage of the proceedings. The plaintiffs allege that RITC prevented a material decline in its assets under management for a fourth consecutive year in 2017 solely because of the money brought in from the Caesars

---

[6] While a district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a . . . motion to dismiss" without converting it into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). The IMA is referenced in plaintiffs' SAC. *See, e.g.*, ECF No. 50 at 6:17, 19:12. Its authenticity has not been questioned, and I find that taking judicial notice of the IMA at this stage is appropriate. *See, e.g.*, *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1067 (N.D. Cal. 2017) (taking judicial notice of plan-related documents at dismissal stage of ERISA suit); *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 132 (D. Mass. 2021) (taking judicial notice of an IMA at dismissal stage of ERISA suit because it was "referenced in the complaint and central to plaintiffs' claims").

defendants. *Id.* at 15. Plaintiffs assert that the "much-needed capital" would "support the [RITC] funds." ECF No. 65 at 20. Similar assertions have supported denials of motions to dismiss in other cases. *See, e.g., Miller v. Astellas US LLC*, 2021 WL 1387948, at *6 (N.D. Ill. Apr. 13, 2021) (finding that plaintiffs plausibly stated a claim for defendants' breach of the duty of loyalty when a defendant investment company allegedly included its own funds in a plan because it "benefited [the company] by 'dramatically increasing its assets under management' for the [funds], through the receipt of hundreds of millions of dollars in Plan assets as 'seed money' for [the company's] investment management business"). Here, plaintiffs go beyond simply identifying a potential conflict-of-interest between RITC's role as an investment management company and its role as ERISA fiduciary; they also allege that RITC acted with the motivation of propping up its (then-declining) proprietary funds.

RITC argues that cases in which other plaintiffs' claims have survived dismissal are distinguishable from the instant one because "it is not a breach of loyalty for a fiduciary to take actions that have the effect of enlarging assets under management so long as those actions are consistent with the interests of participants." ECF No. 76 at 5. I agree with RITC's interpretation of the law but find (*infra* subsection 2) that plaintiffs state a plausible claim that RITC breached its duty of prudence in selecting the challenged funds. Because plaintiffs sufficiently allege that RITC took actions which both had the effect of enlarging the assets under its own management and may have been inconsistent with the interests of Plan participants, I find that plaintiffs have adequately stated a claim for RITC breaching its duty of loyalty.

> 2. *Plaintiffs adequately plead imprudent selection and retention of the RITC funds.*

> > a. *Plaintiffs state a plausible claim for imprudent selection.*

Under ERISA, a fiduciary is required to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). "A court's

task in evaluating a fiduciary's compliance with [its duty of prudence] is to inquire 'whether the [fiduciaries], at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Wright*, 360 F.3d at 1097 (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)). Because of the emphasis on methods, courts focus "not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (internal quotation marks omitted).

Plaintiffs contend that RITC breached the duty of prudence because (1) the RITC funds it selected for inclusion in the Plan menu were performing worse than the funds that RITC replaced, (2) other investors fled the RITC funds as a result of RITC's underperformance, and (3) RITC continued retention of its proprietary funds even after they continued to underperform for the Plan. ECF No. 72 at 11–13. RITC moves to dismiss plaintiffs' claim because (1) plaintiffs fail to provide adequate benchmarks to demonstrate that RITC's funds underperformed, (2) ERISA does not require any level of popularity amongst other plans, and (3) plaintiffs suffer from hindsight bias in complaining of RITC's retention of its allegedly underperforming funds. ECF No. 65 at 16–24.

I find that plaintiffs plausibly state a claim against RITC for breach of the duty of prudence. First, plaintiffs sufficiently allege that the challenged funds were underperforming at the time RITC selected them to replace the Plan's prior investment menu. They allege that the Plan's prior age-based funds, managed by State Street, mostly outperformed RITC's age-based funds over the three- and five-year periods leading up to RITC's decision, as well as over the life cycles of the RITC funds. ECF No. 50 at 13–14. RITC argues that the State Street funds are a cherrypicked point of comparison, that the RITC funds still performed well in absolute terms, and that any potential prior underperformance was too minimal to serve as the basis for a claim of imprudent selection. ECF No. 65 at 15–17. I find no authority requiring plaintiffs to allege

their claim of imprudence by demonstrating that the challenged funds were markedly worse than every possible comparator; at this stage, plaintiffs have sufficiently pled that RITC may have breached its duty by demonstrating that, at the time RITC made its decision to switch the Plan's assets to its own age-based funds, the prior Plan funds were outperforming RITC's funds. Prudence "focus[es] on a fiduciary's conduct in arriving at an investment decision[.]" *White v. Chevron Corp.*, 2016 WL 4502808, at *5 (N.D. Cal. Aug. 29, 2019) (internal quotation omitted). Plaintiffs aver that RITC's decision to replace the Plan's prior age-based funds was tainted by RITC's self-interest—RITC may have had a motive to increase the amount of funds it managed and may have overlooked potential financial detriment to Plan subscribers in order to effectuate that goal.

As further evidence of the RITC funds' underperformance, plaintiffs point out that RITC withdrew $130 million of its own plan assets from RITC's age-based funds in 2016. ECF No. 50 at 15. The duty of imprudence requires a fiduciary "to make such investments and only such investments as a prudent [person] would make of his own property." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015) ("*Tibble I*") (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). RITC's own plan assets are not quite its own property, but the fact that it removed the challenged funds from the Plan menu it provides to its own employees may be indicative of internal concern over the funds' performance in 2016. RITC's decision to withdraw its proprietary funds from its employees' investment menu, while retaining the same funds for Caesars employees' investment menu, is puzzling in light of RITC's status as a fiduciary to the Caesars Plan.

Plaintiffs' argument that other fiduciaries removed their assets from the challenged funds between 2013 and 2016, when combined with the relative underperformance of the RITC funds over that same period of time, further supports the conclusion that RITC's decision to switch the Plan funds may have been imprudent. *See, e.g.*, *Baker v. John Hancock Life Ins. Co.*, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[T]hat in some cases the plan was one of the last

investors propping up a failing fund gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest."). Plaintiffs' allegations regarding the withdrawal of other plan sponsors from RITC's age-based funds make plausible the inference that RITC's funds could have collapsed without the transfusion of cash from the Caesars Plan. Finally, whatever issues defendants have with plaintiffs' comparators for the challenged funds are best left for the summary-judgment stage; at this juncture, plaintiffs have stated a plausible claim that RITC "swapped prudent, popular, nonproprietary fund X for struggling proprietary fund Y." ECF No. 108 at 24. That allegation is sufficient for plaintiffs' claim of imprudent selection to survive dismissal.

> ### b. *Plaintiffs state a plausible claim for imprudent retention.*

Finally, plaintiffs allege a second flavor of imprudence claim, contending that RITC continued to retain the challenged funds even as they underperformed both the State Street age-based funds in 2017 and 2018, as well as RITC's own internal benchmarks. ECF No. 50 at 16–19. Much like plaintiffs' criticism of the decision to replace the State Street funds with RITC's funds, plaintiffs again focus on the RITC funds' lower returns on investment as well as other investors' decisions to pull money from the RITC funds. They argue that the Plan lost more than $100 million as a result of RITC retaining its own funds. *Id.* at 19. As evidence of the challenged funds' underperformance, plaintiffs note that RITC's internal custom benchmarks "can test whether [RITC] is successfully implementing its chosen strategy for its funds," and "each [of RITC's] age-based fund[s] underperformed [RITC's internal] custom benchmark[s] in 2019 . . . and 2020." *Id.* They argue further that RITC's funds again underperformed relative to the State Street funds—as well as the S&P Target Date Indexes[7]—while taking on "comparable and often higher levels of risk." *Id.* at 18.

RITC argues that its monitoring of its own funds was prudent, and that plaintiffs' second allegation of imprudence is "easy to dispense with," because "nobody would say [that]

---

[7] Plaintiffs note that the "S&P Target Date Index series represents a market consensus of asset class exposure and glide path across the universe of target date fund managers. The index is designed to help

two years of underperformance [2017 and 2018] is enough to swap out a fund even if [the underperformance] was substantial and even if you accept [that the plaintiffs'] comparators are appropriate." ECF No. 108 at 17. RITC contends that "the State Street TDFs have very different features from the Challenged TDFs," including different glidepaths through retirement (State Street's TDFs allegedly run "through" retirement, whereas RITC's run "to" retirement (*id.* at 20)) and increased diversification of assets, which help to justify its decision to retain the proprietary funds in the Plan. ECF No. 76 at 10.

I find that plaintiffs allege enough facts to support their second imprudence claim against RITC. There are two plausible explanations for RITC's retention of its proprietary funds: first, that RITC acted imprudently by investing Plan assets into its own funds over objectively better alternatives, or second, that RITC legitimately believed its own funds would outperform the alternatives over the long lifespans of the target-date funds. "To render [plaintiffs'] explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation." *In re Century Aluminum Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).

I disagree with RITC's characterization that plaintiffs merely allege two years of underperformance—they allege that the Russell TDFs underperformed the State Street ones since their inceptions, over three- and five-year periods leading up to 2017, and for the two-year period beginning in 2017. *See generally* ECF No. 50. The complaint should be read as a whole, not parsed piece by piece, to determine whether each allegation is plausible. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). The actions RITC took to evaluate the prudence of retaining its own funds—even after years of alleged underperformance—are knowledge within RITC's control. Thus, plaintiffs cannot be expected to know specific details about RITC's process at this stage. *See Lauderdale v. NFP Retirement, Inc.*, 2022 WL 422831, at *9 (C.D. Cal. Feb. 8,

---

retirement plan fiduciaries screen, select, and monitor appropriate target date funds." ECF No. 50 at 15 n.20.

2022) (citing *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (relaxing pleading requirements because "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage"). Plaintiffs sufficiently allege that RITC breached its duties of loyalty and prudence in selecting the RITC funds; it would thus be reasonable to infer that RITC acted similarly disloyally in retaining the funds, as the same benefits which accrued to RITC's selection would have inhered to RITC's retention. *See Tibble v. Edison Int'l*, 2017 WL 3523737, at *11–12 (C.D. Cal. Aug. 16, 2017) (finding a breach of fiduciary duty when a fiduciary failed to immediately remove funds and should have known that they were imprudent investments at the time). Because plaintiffs' allegations about RITC's breach of the duty of loyalty raise the possibility of RITC breaching its duty of prudence from possible to plausible, I find that plaintiffs meet their pleading burden with respect to RITC.

       *c.   Plaintiffs plausibly allege that the Caesars defendants breached the duty of prudence.*

       Plaintiffs assert that the Caesars defendants breached their duty of prudence to Plan holders by failing to survey RITC's investment plan prior to outsourcing their fiduciary duties to RITC, failing to review or properly monitor RITC's investments, and by failing to remove RITC's imprudent investments. ECF No. 50 at 23. The Caesars defendants argue that ERISA precludes them from being held liable for the breaches of a co-fiduciary, that plaintiffs fail to plausibly allege that they knew or enabled RITC's alleged fiduciary breaches, and that plaintiffs fail to plausibly allege their imprudent selection claim.

       *1.   Plaintiffs may not allege co-fiduciary claims against the Caesars defendants.*

       ERISA contemplates a fiduciary's liability for breaches by co-fiduciaries. 29 U.S.C. § 1105. "Co-fiduciary liability is a shorthand rubric under which one ERISA fiduciary may be liable for the failings of another fiduciary." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998). It inheres "if a fiduciary knowingly participates in or conceals another fiduciary's breach, enables such other to commit a breach, or learns about such a breach and fails to make reasonable efforts to remedy it." *Id.* at 18–19. As relevant to the Caesars defendants, ERISA states, "[i]f an

1 investment manager . . . [has] been appointed under section 1102(c)(3) of this title, then,

2 notwithstanding subsections (a)(2) and (3) and subsection (b), no trustee shall be liable for the

3 acts or omissions of such investment manager . . ." *Id.* § 1105(d)(1). The parties disagree about the

4 scope of protection provided by § 1105(d)(1). *Compare* ECF No. 66 at 14 (Caesars defendants

5 argue that they are precluded from liability) *with* ECF No. 73 at 22 (plaintiffs argue that § 1105(c)

6 has a carveout from § 1105(d)(1)'s safe harbor to attach liability).

7        The plain language of the statute seems to indicate that plaintiffs' allegations against the

8 Caesars defendants, insofar as they are premised on co-fiduciary liability, may not proceed.

9 Section 1105(d) is clear: a trustee shall not be liable for the acts or omissions of a properly

10 appointed investment manager. While § 1105(c) establishes potential bases for the Caesars

11 defendants to be liable for primary violations of fiduciary duties, § 1105(d) extinguishes bases for

12 their liability for RITC's alleged breaches, except to the extent that the Caesars defendants were

13 aware of such breaches but failed to take reasonable efforts to remedy them. Other courts in the

14 Ninth Circuit, including authority otherwise relied upon by plaintiffs, agree. *See, e.g., Lauderdale*,

15 2022 WL 422831, at *7 ("The [c]ourt . . . finds that section 1105(d)(1) provides protection from

16 liability to named fiduciaries upon appointment of an investment manager."). Finally, there is no

17 indication in the statute that Congress intended for the "safe harbor" of § 1105(d)(1) to not apply

18 to liability premised on § 1105(c). Consequently, I find that, under § 1105(d)(1), the Caesars

19 defendants cannot be held liable for breaches of co-fiduciary duty. This interpretation of the

20 statutory scheme accords with what other courts across the country have found. *See, e.g., Beddall*,

21 137 F.3d at 19 (citing § 1105(d)(1) for the proposition that "a trustee shall only be liable for a

22 money manager's violation if the former participates in or acts to conceal the breach"). 

23 Consequently, I grant the Caesars defendants' motion to dismiss the co-fiduciary claims for

24 liability against them.

25

26

    2.   *Plaintiffs plausibly state a claim against the Caesars defendants for imprudent selection.*

Separate from the co-fiduciary liability claim, plaintiffs also bring a claim against the Caesars defendants for actions undertaken *before* RITC was a fiduciary to the Plan. They allege that the Caesars defendants failed to prudently survey RITC's investment plan before appointing RITC to overhaul the Plan menu. ECF No. 50 at 24. A plan fiduciary has a "duty to prudently select and monitor any service provider or designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv). The continuing duty to monitor and remove imprudent investments "exists separate and apart from the duty to exercise prudence in selecting the investments at the outset." *Tibble I*, 575 U.S. at 529. Thus, while I have determined that the Caesars defendants may not be held liable for RITC's monitoring and failure to remove imprudent investments while RITC was the named fiduciary in charge of the Plan's assets, the duty to exercise prudence in selecting RITC at the outset is an entirely separate matter.

Plaintiffs allege that defendant Plan Investment Committee "[f]ailed to prudently survey [RITC's] investment plan prior to outsourcing fiduciary duties" to RITC, and that based on RITC's alleged conflict of interest in selecting its own funds along with the "inferior track record of [RITC's] funds relative to the Plan's existing menu," a prudent fiduciary "would not have selected [RITC] and endorsed its menu overhaul." ECF No. 73 at 14–15. Plaintiffs' direct allegations as to what process the Caesars defendants used to select RITC are relatively sparse, but they argue that they "are not required to allege details regarding fiduciary process at this stage." *Id.* at 12–13, 15 (collecting cases).

I agree; plaintiffs at this stage should not be required to plead details of the fiduciary process with specificity because "specific facts about the fiduciary's internal processes . . . [are] typically in the exclusive possession of a defendant." *Fernandez v. Franklin Res., Inc.*, 2018 WL 1697089, at *7 (N.D. Cal. Apr. 6, 2018); *see also Braden*, 588 F.3d at 598 ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences."); *Pension Ben. Guar. Corp. ex rel. St. Vincent*

1   *Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (a

2   complaint's omission of direct facts regarding defendants' processes "is not fatal to a claim

3   alleging a breach of fiduciary duty" when a court may infer from "circumstantial factual

4   allegations" that the process was flawed). Here, plaintiffs allege that (1) the previous menu

5   options offered by the Plan performed adequately (ECF No. 50 at 14), (2) the Caesars defendants

6   selected RITC and permitted it to overhaul the Plan menu with entirely proprietary options (*id.*

7   at 20), (3) the proprietary funds that RITC selected were allegedly objectively worse options

8   than the replaced funds (*id.* at 14), and (4) the Caesars defendants retained the proprietary funds

9   even after they continued to underperform (*id.* at 20). At this stage, those allegations are

10  sufficient. Consequently, I find that the plaintiffs state a claim against the Caesars defendants

11  for the imprudent selection and monitoring of RITC.

12  **IV.    Conclusion**

13          IT IS HEREBY ORDERED that defendant RITC's motion to dismiss **[ECF No. 65] is**

14  **DENIED**.

15          IT IS FURTHER ORDERED that the Caesars defendants' motion to dismiss **[ECF No.**

16  **66] is GRANTED in part and DENIED in part**. The imprudent-selection claim may proceed,

17  but the co-fiduciary claim may not.

18          IT IS FURTHER ORDERED that plaintiffs' motion for leave to file supplemental

19  authority **[ECF No. 103] is GRANTED**.

20          DATED: March 13, 2023

21

22                                            _____

23                                            Cristina D. Silva
                                              United States District Judge

24

25

26