UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Danny Wanek et al.,

    Plaintiffs

v.

Russell Investments Trust Company, et al.,

    Defendants

Case No. 2:21-cv-00961-CDS-BNW

**Order Regarding Defendants' Motions for Summary Judgment and Motions to Seal**

[ECF Nos. 198, 200, 234, 236]

    Participants of a 401(k) plan bring this suit against the plan's fiduciaries for alleged breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"). Defendant Caesars Holdings, Inc.[1] sponsors the 401(k) plan, the Caesars Entertainment Corporation Savings & Retirement Plan ("Plan"), for its eligible employees. Caesars Holdings formed the Plan Investment Committee and the 401(k) Plan Committee (collectively, the "Caesars defendants") to oversee the Plan's investments. The Committee hired defendant Russell Investments Trusts Company as the Plan's investment manager.

    Plaintiffs Danny Wanek, Juan Duarte, and Rick Ruberton, as representatives of the certified class of participants and beneficiaries of the Plan, sue Russell and the Caesars defendants for alleged breaches of fiduciary duties under ERISA arising from Russell's role as the Plan's investment manager. Fifth. am. compl., ECF No. 175. Russell and the Caesars defendants both move for summary judgment, arguing that the plaintiffs fail to raise a triable issue of fact. Caesars' mot. summ. j., ECF No. 198; Russell's mot. summ. j., ECF No. 200.[2] Russell also moves to seal documents filed in connection with the summary judgment motions. Russell's mot. seal, ECF Nos. 234, 236. For the reasons stated herein, I hereby grant the Caesars defendants' motion for summary judgment and deny Russell's motion for summary judgment. I also grant Russell's

---

[1] Caesars Holdings, Inc. was formerly known as Caesars Entertainment Corporation prior to late 2020, when Eldorado Resorts, Inc. purchased Caesars and reorganized the company. The parties variously refer to Caesars Holdings, Inc., and Caesars Entertainment Corporation, but both are the same entity.
[2] The motions for summary judgment are fully briefed. *See* Opp'n, ECF Nos. 205, 207; Replies, ECF Nos. 212, 213.

motions to seal documents filed in support of the Caesars defendants' motion for summary judgment and in support of the plaintiffs' respective responses to the defendants' motions for summary judgment.

## I. Background

### A. The Parties

#### 1. *Plaintiffs*

The plaintiffs are Plan participants. ECF No. 175 at 3.[3] Plaintiffs Danny Wanek and Juan Duarte are current participants—Wanek since 2007, and Duarte since 1994. *Id.* Plaintiff Rick Ruberton participated in the Plan from at least 2016 to 2021. *Id.* Each of their accounts were transferred to Russell's age-based funds after Russell assumed control of the Plan in 2017. *Id.* They bring this suit on behalf of a certified class of individuals, which includes all participants and beneficiaries of the Plan at any time from August 1, 2017, through December 17, 2021 ("class period"), excluding any employees of Caesars with responsibility for the Plan's investment or administrative functions. Order, ECF No. 195.

#### 2. *Caesars defendants*

Caesars Holdings, Inc. is a holding company with global entertainment, gaming, and hospitality operations. ECF No. 175 at ¶ 15. It also sponsors the Plan, which holds the retirement savings of over 40,000 current and former Caesars employees. The Plan, Caesars' Ex. 1, ECF No. 198-4 at 3–8; Investment Committee Charter, Caesars' Ex. 2, ECF No. 198-5. Caesars appoints an Investment Committee[4] to serve as the fiduciary responsible for managing the Plan. ECF No. 198-5 at 2. The Committee has the sole discretionary authority to manage the investment of Plan assets. *Id.* The Committee may also choose to delegate this authority to an ERISA § 3(38) investment manager. *Id.*

---

[3] Unless otherwise noted, citation to the complaint is to provide background information and does not serve as a finding of fact.
[4] During the class period, Caesars dissolved the Plan Investment Committee and created the 401(k) Plan Committee to assume its investment duties. ECF No. 198-5.

### 3. Defendant Russell

The Investment Committee delegated its investment duties to Russell in 2016. 11/14/2016 Meeting Mins., Caesars' Ex. 19, ECF No. 198-22. Russell is a non-depository trust company that provides trust and investment management services through commingled multi-manager funds, principally to qualified ERISA and governmental plans. RFP Resp., Caesars' Ex. 12, ECF No. 198-15 at 4. It offers "fiduciary outsourcing" to defined contribution retirement plans. *Id.* at 5. During the class period, Russell served as the ERISA § 3(38) investment manager and fiduciary of the Plan. ECF No. 198-22; Investment Management Agreement, Caesars' Ex. 16, ECF No. 198-19.

**B. The Plan**

The Plan is an ERISA § 404(c) plan, meaning that participants may choose between investment options made available by the Plan's fiduciaries. ECF No. 198-4; 29 C.F.R. § 2550.404c-1(a)(1), (e)(4). The Plan is also an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A) and a defined contribution or "individual account" plan under 29 U.S.C. § 1002(34). ECF No. 175 at ¶ 20; Russell's answer, ECF No. 176 at ¶ 20; Caesars' answer, ECF No. 181 at ¶ 20. A defined contribution plan gives participants retirement benefits not exceeding the value of their individual investment accounts—a limitation determined by "the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

Caesars is a fiduciary of the Plan because it appoints and removes Investment Committee members. *See* ECF No. 198-4. The authority to appoint and remove other fiduciaries constitutes "discretionary authority or discretionary control respecting management of [a] plan" and confers fiduciary status under ERISA. 29 U.S.C. § 1002(21)(A). The Plan Investment Committee and 401(k) Plan Committee are fiduciaries because they respectively had and have authority to select and remove investments for the Plan, as well as to outsource their investment duties to an "investment manager" under ERISA § 3(38). *Id.*; ECF No. 198-4. Authority to select and remove investments constitutes "any authority or control respecting management or disposition of

assets" and confers fiduciary status under ERISA. 29 U.S.C. § 1002(21)(A). Also, authority to appoint and remove investment managers under ERISA § 3(38) constitutes "discretionary authority or discretionary control respecting management of [a] plan" and likewise confers fiduciary status under ERISA. *Id.*

### C. The Undisputed Facts

In January 2016, the Plan Investment Committee retained a consultant, Tejera & Associates, to run a request for proposal ("RFP") to select and hire an investment manager for the Plan. Tejera Statement, Caesars' Ex. 6, ECF No. 198-9. Tejera & Associates is an independent consultancy that helps sponsors of retirement plans and institutional funds select providers for managing their investments. Tejera Letter, Caesars' Ex. 7, ECF No. 198-10. Together the Committee and Tejera selected candidates to receive the RFP and Information Request. *See* RFP Candidate Profiles, Caesars' Ex. 9, ECF No. 198-12; RFP Information Request, Caesars' Ex. 8, ECF No. 198-11. In the Information Request, Caesars expressed interest in white label funds, target date funds ("TDFs"), and stable value funds. ECF No. 198-11 at 6.

Russell was one of five candidates selected. Tejera's Evaluation Report, Caesars' Ex. 10, ECF No. 198-13 at 4. In response to the RFP, Russell detailed qualifications such as its rank in the top-five largest consultants globally based on assets under management, its 35 years of experience managing multi-manager portfolios, its recognition as the fourth-largest defined contribution custom TDF manager. ECF No. 198-15 at 3, 5, 15. It also described Russell's protocol for managing potential conflicts of interest. *Id.* at 9.

After receiving the candidates' responses, Tejera made a Proposal Evaluation Report for the Committee. ECF No. 198-13. The report ranked Russell as one of the top-three candidates, observing that Russell has "offered discretionary services since 1980" but that its "experience with DC plans is weaker with only 2 over $1B in assets." *Id.* at 7, 18.

Russell moved forward as one of three finalists for the role. *See id.* at 7. In its final presentation, Russell proposed including TDFs with a more conservative glidepath near retirement compared to the State Street funds currently in the Plan. Presentation, Russell's Ex. 14, ECF No. 200-16 at 9. It also switched from passive management to a blend of active and passive. *Id.* at 15.

In November 2016, the Committee reviewed and approved Russell's proposal to serve as the ERISA § 3(38) Plan investment manager. ECF No. 198-22. A month later, Caesars and Russell executed an Investment Management Agreement ("IMA"). ECF No. 198-19. Under the agreement, Russell would provide delegated investment management services for the Plan in exchange for a service fee based on overall Plan assets under management ("AUM"). *Id.* at 4–7, 16–17. This "cost plus" fee arrangement was product-agnostic: Russell would receive the same fee regardless of whether it selected Russell funds for the Plan. *Id.* at 16–17. As part of its services, Russell would also provide quarterly performance reports to the Investment Committee. *Id.* at 13.

In August 2017, Russell assumed control of the Plan's investment menu and transferred the Plan's assets to the selected menu. 11/17/2017 Meeting Mins., Caesars' Ex. 17, ECF No. 198-20; 11/17/2017 Meeting Presentation, Caesars' Ex. 18, ECF No. 198-21 at 5. Russell's investment menu for the Plan included Russell "Lifecycle" TDFs and white labeled asset class funds. Presentation, Caesars' Ex. 11, ECF No. 200-13 at 5, 7–12.

The nine asset class funds Russell selected for the Plan were the Enhanced Index U.S. Equity Fund, Russell Investments 1000 Index Fund, Small Cap Fund, International Markets Fund, International Index Fund, Real Asset Fund, Multi-Manager Bond Fund, Fixed Income II Fund, and Short Term Investment Fund. *Id.* The Russell TDFs served as the Plan's default investment alternative. *Id.*; Russell's Resp. Caesars RFP, Russell's Ex. 19, ECF No. 200-21 at 12.

TDFs are designed to invest more conservatively as participants near the target date. US DOL, Russell's Ex. 6, ECF No. 200-8 at 2. The shift in the TDF's asset allocation over time is

referred to as the TDF's "glide path." *Id.* The Russell TDFs expanded the Plan's previous TDF offering with retirement date increments of five years instead of ten years. ECF No. 198-20.

The Committee maintained an Investment Policy Statement ("IPS"), which Russell helped revise while serving as the Plan's investment manager. *Id.*; 2015 Investment Policy Statement, Caesars' Ex. 3, ECF No. 198-6; 2018 Investment Policy Statement, Caesars' Ex. 4, ECF No. 198-7; ECF No. 198-19 at 13; ECF No. 198-20; 05/07/2018 Meeting Minutes, Caesars' Ex. 32, ECF No. 198-35. Under the IPS, Russell would select investment options that covered "a risk/return spectrum of appropriate investment classes," accommodated participants' "varying degrees of investment sophistication and interest levels in managing their accounts," and resulted in reasonable costs and expenses. ECF No. 198-7. The IPS charged the Committee with undertaking a "detailed review and assessment of Russell's performance" periodically. *Id.* at 8. It also stated that "the appropriate measurement period for evaluation [of performance] must be of sufficient length to cover economic and capital market cycles (i.e., historically five years or longer)." *Id.*

The Committee held quarterly meetings with Russell to review the Plan's performance. *See, e.g.*, Fourth Quarter 2018 Meeting Presentation, Caesars' Ex. 27, ECF No. 198-30; First Quarter 2019 Meeting Presentation, Caesars' Ex. 26, ECF No. 198-29; Fourth Quarter 2019 Meeting Presentation, Caesars' Ex. 29, ECF No. 198-32; First Quarter 2021 Meeting Presentation, Caesars' Ex. 28, ECF No. 198-31. Before each quarterly meeting, Russell gave the Committee members quarterly reports for their review. Causey dep., Caesars' Ex. 39, ECF No. 198-42 at 6–10. The reports explained market conditions and the performance of Plan investments. *See, e.g.*, 08/02/2018 Meeting Mins., Caesars' Ex. 25, ECF No. 198-28; 02/26/2020 Meeting Mins., Caesars' Ex. 31, ECF No. 198-34; ECF No. 198-35.

### D. The Litigation

The plaintiffs bring this ERISA class-action suit on behalf of a certified class of Plan participants and beneficiaries. ECF No. 195; ECF No. 175 at ¶ 65. They allege that Russell

breached its fiduciary duties of loyalty and prudence under ERISA by replacing the Plan's investment options with inferior Russell funds. ECF No. 175 at ¶¶ 73–87. Russell's "self-serving swap" was allegedly a "life preserver for its struggling funds" that "brought in $1.4 billion in new investment at a critical time when other plan sponsors were leaving Russell's funds." *Id.* at ¶ 1.

The swap allegedly cost Plan participants over $100 million in lost investment earnings. *Id.* at ¶¶ 1, 55. The Russell funds are alleged to have "often underperform[ed] the Plan's prior funds by 2–3%/year and the S&P Target Date indexes by more than 1%/year" while accepting similar or higher levels of risk. *Id.* at ¶ 56. Russell funds have allegedly missed Russell's own internal benchmarks over that same timespan as well. *Id.* at ¶ 57. All the while, two more fiduciaries representing six other plans pulled their investments from Russell's age-based funds in 2018 and 2019, leaving the Plan with 74% of the reported assets in Russell's age-based funds at the end of 2019. *Id.* at ¶ 60.

The plaintiffs also claim that the Caesar defendants breached their duty of prudence, including failure to monitor appointed fiduciaries, for their engagement with Russell. ECF No. 175 at ¶¶ 80–87. In opposition, the Caesars defendants proffer evidence of their prudent process for hiring and overseeing Russell. *See generally* ECF No. 198. The Investment Committee's meeting minutes show that its members discussed the pros and cons of hiring Russell to manage the Plan's assets before approving that decision. ECF No. 198-22. The pros that led to the approval include Russell's low fees and simple choice of investments. ECF No. 198-42 at 11–21; Goldich dep., Caesars' Ex. 40, 198-43 at 6–15; Hession dep., Caesars' Ex. 41, ECF No. 198-44 at 13–15. Depositions reveal that the Committee members knew Russell had an asset-protective mindset and that Russell target date funds ("TDFs") had a more conservative glide path near retirement. ECF No. 198-42 at 18–20; ECF No. 198-44 at 12–15. Even so, Russell was expected—and contractually obligated—to select investments in the Plan's best interest, even if that meant selecting non-Russell funds. ECF No. 198-19 at 4–6; ECF No. 198-43 at 9–12; ECF No. 198-44 at 17–18; ECF No. 198-13 at 8.

The plaintiffs request, *inter alia*, declaratory relief, an order compelling the defendants to remedy the financial losses sustained by the Plan, and permanent injunctive relief prohibiting the defendants from further ERISA violations. ECF No. 175 at 25. Also, Russell moves to seal documents filed in support of the Caesars defendants' motion for summary judgment and documents filed in support of the plaintiffs' responses to the defendants' motions for summary judgment. ECF Nos. 234, 236.

## II.  Legal Standard

### A.  Motion for summary judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmovant, indicates "no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit" based on the governing law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "mere disagreement or the bald assertion that a genuine issue of material fact exists" is not enough to defeat summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

Because the plaintiffs bear the burden of proof at trial, a moving defendant need only point to an absence of evidence on an element of the plaintiffs' case. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). The plaintiffs must then present "affirmative evidence" to raise a genuine issue of material fact. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). And it "must do more than simply show that there is some metaphysical doubt." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

B. ERISA statutory framework

ERISA protects "the interests of participants in employee benefit plans and their beneficiaries" by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). The "crucible of congressional concern" in enacting ERISA "was misuse and mismanagement of plan assets by plan administrators." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985).

To this end, ERISA requires private pension plan assets to be held in trust for the exclusive benefit of plan participants and beneficiaries. 29 U.S.C. §§ 1102(a)(1), 1003(a). The authority to administer the plan must be vested in one or more named fiduciaries. *Id.* at § 1102(a)(1). The fiduciary need not be an independent party; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. *Id.* at § 1108(c)(3).

ERISA imposes three general duties on pension plan fiduciaries: (1) discharge duties prudently, (2) diversify investments to minimize the risk of loss, and (3) act in the sole interest and for the exclusive benefit of the participants. 29 U.S.C. § 1104(a)(1); *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1093–94 (9th Cir. 2004). These fiduciary duties are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996). And one way in which they are breached is when a fiduciary who is "responsible for plan investments under ERISA" fails to "follow the written statements of investment policy." *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001).

III. Discussion

The plaintiffs claim that the defendants breached their fiduciary duties under ERISA. Specifically, they claim that Russell breached the duties of loyalty and prudence in selecting Russell funds over higher-performing funds for the Plan, and that the Caesars defendants breached their duty of prudence in hiring and retaining Russell as the Plan's investment manager.

### A. Defendant Russell's motion for summary judgment

Russell filed a motion for summary judgment, arguing that the plaintiffs failed to raise any triable issue of fact as to Russell's loyalty and prudence under ERISA. ECF No. 200. But I find that the evidence, viewed in the light most favorable to the plaintiffs, creates a genuine issue of material fact as to whether Russell breached its duties of loyalty and prudence.

#### 1. Duty of Loyalty

ERISA's duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). The "potential for a conflict of interest," without more, does not amount to breach of this duty. *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1026 (9th Cir. 2025) (citation omitted). An ERISA fiduciary may have conflicting interests—including "financial interests adverse to beneficiaries"—so long as the fiduciary "wear[s] the fiduciary while making fiduciary decisions." *Id.* (quoting *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000)).

The plaintiffs claim that Russell violated its duty of loyalty by prioritizing Russell funds' AUM over the Plan's best interest when selecting Plan investments. Russell responds that its "cost plus" fee arrangement provided no compensation or financial benefit for selecting Russell funds for the Plan. ECF No. 198 at ¶ 35; ECF No. 198-19 at 16–17. The arrangement calculated the service fee based on total AUM, so Russell would be able to count the Plan's assets as AUM regardless of whether it selected Russell funds. ECF No. 198-19 at 16–17.

But the evidence indicates a genuine issue of material fact as to Russell's reasons for selecting Russell funds for the Plan's investment menu. There is evidence suggesting that Russell's product-agnostic, "cost plus" fee arrangement with Caesars was a special deal that Russell cut to secure the "much needed AUM" in the Russell funds. ECF No. 205-15. Indeed, Russell acknowledged internally that "Caesars would be a huge DC win and we need AUM." April 19, 2016 Email chain, Pls.' Ex. 29, ECF No. 205-31. This "need" for AUM was not lost in the "cost plus" fee arrangement offered to Caesars—in fact, the deal itself was "dependent on the

active AUM and TDFs moving to Russell funds." May 5, 2016 Email chain, Pls.' Ex. 27, ECF No. 207-29 at 2. The value of this arrangement to Russell is elucidated by Russell's own report, which diagnosed "low AUM" as a key reason why other fiduciaries rejected Russell TDFs and explained that increasing assets in Russell TDFs also increased new cash flow for Russell. Product Objectives, Pls.' Ex. 8, ECF No. 205-10.

The evidence also indicates a genuine issue of material fact as to Russell's reasons for retaining its own funds on the Plan's investment menu during the class period. The record shows that switching Plan assets out of Russell TDFs would mean losing over half—even 70 percent—of Russell TDF AUM. April 1, 2020 Email chain, Pls.' Ex. 34, ECF No. 205-36. And Russell's portfolio managers predicted that Russell TDFs would "shrivel up and die" if Caesars were to terminate Russell. August 18, 2021 Email chain, Pls.' Ex. 9, ECF No. 205-11.

While both parties proffer evidence concerning Russell's duty of loyalty, evaluation of the competing arguments together with the evidence reveals there is a triable issue of fact as to whether Russell violated its duty of loyalty as an ERISA § 3(38) investment manager. Russell's argument that there was no real conflict of interest thanks to its product-agnostic fee arrangement with Caesars fails to adequately address the other incentives that purportedly motivated Russell to select its own funds for the Plan. Because there is a genuine issue of material fact as to Russell's reasons for selecting and retaining Russell funds on the Plan's investment menu, I deny Russell's motion for summary judgment on the duty of loyalty claim.

### 2. *Duty of Prudence*

ERISA's duty of prudence requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances" as that of a prudent person acting in a similar capacity and with similar familiarity of the matters. 29 U.S.C. § 1104(a)(1)(B). Courts "evaluate[] prudence prospectively, based on the methods the fiduciaries employed, rather than retrospectively, based on the results they achieved." *Anderson*, 137 F.4th at 1021. This inquiry turns on whether the fiduciary, "at the time they engaged in the challenged transactions,

employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Id.*

In *Anderson*, the court rejected the plaintiff's prudence claim against ERISA trustees because the plaintiff failed to allege facts showing, directly or circumstantially, that the trustees "employed unsound methods in making their investment decisions." *Id.* at 1021. There, the plaintiff asked the court to infer that the trustees used improper methods because they selected private equity and hedge funds that underperformed "traditional assets like stocks and bonds." *Id.* at 1022. But the court declined to do so because the plaintiff's comparators did not have "similar objectives" to the selected funds and, in turn, could not "provide a sound basis for comparison." *Id.* at 1022–23.

Here, Russell argues that it fulfilled its duty of prudence as a matter of law because the Russell funds were objectively prudent investments that Russell selected and monitored with objectively prudent processes. *See* ECF No. 200 at 14–25. But unlike the circumstantial allegations of unsound methods in *Anderson*, here there is direct evidence showing that Russell employed unsound methods in deciding to include Russell funds on the Plan. Although Russell was not contractually obligated to select Russell funds for the Plan, the record shows that Russell funds were internally required to be included on the Plan's investment menu. March 22, 2016 Email chain, Pls.' Ex. 42, ECF No. 205-44. This internal requirement is consistent with the reduced fees that Russell executives were willing to offer, "dependent on the active AUM and TDFs moving to Russell funds." ECF No. 207-29 at 2. The record also shows that Russell was "unwilling" to serve as a DC plan fiduciary on non-Russell TDFs because "the economics don't support it." May 24, 2018 Email chain, Pls.' Ex. 44, ECF No. 205-46.

The parties disagree as to whether the Russell funds were objectively prudent investments. The plaintiffs' expert opines that "no reasonable fiduciary would choose to replace the State Street TDFs with the Russell TDFs, and no reasonable fiduciary of a $1.4 billion retirement plan would select the Russell TDFs." Stone report, Pls.' Ex. 13 at 6. However, unlike

the comparators required in *Anderson*, comparing the performance of Russell funds with peer funds is not necessary to determine whether Russell fulfilled its duty of competence as a matter of law. Rather, the evidence of Russell's willingness (or lack thereof) to select non-Russell funds for the Plan is sufficient to preclude summary judgment. That evidence suggests that Russell potentially employed unsound methods in selecting Plan investments, which is material to the duty of loyalty claim. Thus, when viewed in the light most favorable to the plaintiffs, the evidence creates a genuine issue of material fact as to whether Russell breached its duty of loyalty. Russell's motion for summary judgment is therefore denied.

### B.  The Caesars defendants' motion for summary judgment

The Caesars defendants argue that they are entitled to summary judgment because their process for selecting, hiring, and monitoring Russell was prudent as a matter of law. *See* ECF No. 198 at 23–31. ERISA's duty of prudence requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances" as that of a prudent person acting in a similar capacity and with similar familiarity of the matters. 29 U.S.C. § 1104(a)(1)(B). Courts applying this standard "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise" because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

The plaintiffs' imprudence claim against the Caesars defendants largely centers on the performance of Russell TDFs. A prudent fiduciary of the plan, the plaintiffs argue, would neither hire Russell nor retain its services in light of the underwhelming performance of Russell TDFs. But that argument fails for three reasons.

First, the performance of Russell TDFs is not dispositive as to whether the Caesars defendants exercised prudence in hiring Russell as the Plan's asset manager. *See Anderson*, 137 F.4th at 1021. The Caesars defendants exercised prudence in Russell's hiring by brining on Tejera & Associates to assist with the RFP—a rigorous process designed to vet and select the best investment manager for the Plan. ECF No. 198-42; ECF No. 198-10. With the help of Tejera,

the Committee selected lead candidates across the country to participate in the RPF, reviewed the candidates' detailed responses, made thorough evaluations of the candidates, conducted additional external due diligence of the candidates, screened for conflicts of interests, met the finalists in person, negotiated lower fees, and discussed the pros and cons of each finalist. ECF No. 198-13.

Second, the Committee outsourced its investment selection authority to Russell. ECF No. 198-4. That is, the Committee's hiring of Russell was not necessarily a request for Russell funds to appear on the Plan's investment menu. Rather, Russell was hired to manage Plan investments in the Plan's best interest. ECF No. 198-43 at 9–12; ECF No. 198-44 at 17–18; ECF No. 198-13 at 8. And if selecting Russell funds was not in the Plan's best interest, then Russell was obligated to not do so. ECF No. 198-19 at 4–8; ECF No. 198-43 at 9–12; ECF No. 198-44 at 17–18; ECF No. 198-13 at 8.

Third, the Russell funds were only included on the Plan from 2017 to 2021—a period too short to draw conclusions about their performance. *See* ECF No. 198-21; 2021 Caesars Form 550, Russell's Ex. 38, ECF No. 198-41 at 4. The IPS stated "that the appropriate measurement period for evaluation [of performance] must be of sufficient length to cover economic and capital market cycles (i.e., historically five years or longer)." ECF No. 198-7. Since the Russell funds were only on the Plan's investment menu for four years, it would have been premature for the Caesars defendants to intervene and remove them. Further, Russell was hired to select investment options for the Plan in the best interest of its participants. ECF No. 198-22; ECF No. 198-19 at 4–8. Requiring the Committee to quickly veto Russell's investment menu without a meaningful opportunity to test its performance would defeat the purpose of delegating investment selection authority. Because the Committee acted prudently in hiring Russell as the Plan's investment manager, it was prudent for them to also trust Russell's initial investment menu.

In addition to those arguments, the plaintiffs also contend that the Caesars defendants failed to appropriately monitor Russell. But the evidence shows that Russell made quarterly reports and met with the Committee on a quarterly basis to discuss those reports, which explained market conditions and the Plan's performance. *See, e.g.*, ECF No. 198-30; ECF No. 198-29; ECF No. 198-32; ECF No. 198-31. These quarterly meetings and reports aligned with protocol set forth in the IPA, which charged the Committee with undertaking a detailed review and assessment of Russell's performance periodically. ECF No. 198-7; ECF No. 198-28; ECF No. 198-34; ECF No. 198-35. It also aligned with the IMA's terms. ECF No. 198-19 at 13.

Thus, I find that the evidence indicates no genuine issue of material fact when viewed in the light most favorable to the plaintiffs. I therefore grant the Caesars defendants' motion for summary judgment.

**C. Russell's motions to seal supporting documents**

Russell moves to seal documents filed by the Caesars defendants in support of their summary judgment motion, as well as the documents filed by the plaintiffs in support of their opposition to the defendants' summary judgment motions. ECF Nos. 234, 236.

When ruling on a motion to seal, courts "start with a strong presumption in favor of access to court records." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). The moving party bears the burden of overcoming the presumption under one of two standards: the "compelling reasons" standard or the "good cause standard." *Id.* at 1096–97. The compelling reason standard applies to records attached to a dispositive motion, while the good cause standard applies to records attached to a discovery motion unrelated to the case's merits. *Id.*

Here, the compelling reason standard applies because Russell seeks to seal materials that are attached to dispositive motions directly related to the case's merits, not discovery motions. Thus, I may only seal the records if I find a "compelling reason" based on articulable facts. *Id.* (quoting *Kamakana*, 447 F.3d at 1179). In ruling on Russell's motion, I must also weigh "the

competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1097.

I find that Russell offers a compelling reason to seal the records at issue because they contain sensitive business information. The Ninth Circuit has identified "sources of business information that might harm a litigant's competitive standing" as one type of record that satisfies the compelling reason standard. *Id.* Further, Russell has submitted redacted copies of the records to the court for public access. Those copies narrowly redact only the most sensitive information. Thus, even if the disputed records are sealed, the public will still have access to most of their contents. I find that the balance of interests favors sealing the unredacted documents at issue. Therefore, I grant Russell's motions to seal and adopt the proposed orders therein (ECF Nos. 234-5, 236-5), which will be filed separately.

### IV. Conclusion

IT IS HEREBY ORDERED that the Caesars defendants' motion for summary judgment [ECF No. 198] is GRANTED.

IT IS FURTHER ORDERED that defendant Russell's motion for summary judgment [ECF No. 200] is DENIED.

IT IS FURTHER ORDERED that Russell's motion to seal the documents filed in support of the plaintiffs' responses to the defendants' motions for summary judgment [ECF No. 234] is GRANTED. A separate order to issue.

IT IS FURTHER ORDERED that Russell's motion to seal the documents filed in support of the Caesars defendants' motion for summary judgment [ECF No. 236] is GRANTED. A separate order to issue.

Dated: September 25, 2025

_____
Cristina D. Silva
United States District Judge